**HOME BOX OFFICE, INC., Plaintiff,**

v.

**DIRECTORS GUILD OF AMERICA, INC., Robert B. Aldrich, Michael H. Franklin, Ernest Ricca, and Glenn Gumpel, Defendants.**

No. 78 Civ. 3095.

United States District Court, S. D. New York.

Feb. 2, 1982.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiff; George G. Gallantz, Bettina B. Plevan, and David Aronson, New York City, of counsel.

Peter A. Gross, Gen. Counsel, and Shelley D. LaVine, Associate Counsel, New York City, for Home Box Office, Inc.

Dickstein, Shapiro & Morin, New York City, for defendants; Sidney Dickstein, William W. Osborne, Jr., Joel B. Kleinman, Michael E. Nannes, and Charles W. Saber, New York City, of counsel.

Alan Gordon, Gen. Counsel, New York City, for Directors Guild of America, Inc.

## OPINION AND ORDER

SOFAER, District Judge:

Home Box Office, Inc. ("HBO"), brought this action to enjoin defendants from enforcing certain agreements and engaging in certain conduct alleged to violate section 1 of the Sherman Act, 15 U.S.C. § 1 (1976). HBO, a subsidiary of Time, Inc., is a pioneer in the pay-television business. It transmits television programs, often via satellite, to cable television systems for purchase by subscribing consumers. Approximately two-thirds of its programming consists of motion pictures licensed from others. HBO is the industry leader, however, in developing original programming, currently consisting in large part of sports and entertainment programs. All original programming produced by HBO, or by separate produc-

tion companies that sell or license their programs to HBO, requires the use of television directors, associate directors, and other personnel.

Defendant Directors Guild of America, Inc. (the "Guild"), is the collective bargaining representative of television film directors, associate directors, and other production personnel. The Guild seeks to represent all directors and accepts as a member any person who has previously worked as a director and who is willing to pay membership dues and to abide by the Guild's conditions of membership. The Guild is the successor by merger of the Screen Directors Guild, founded in 1936, and the Radio Directors Guild, founded in the mid-1940s.[1] At present, the Guild has approximately 3,500 director members, of whom only about one-third, or 1200, are actively engaged in directing, the others having retired or moved on to other specialties. It has collective bargaining agreements with about 1,500 employers, as well as with some 400 "loan-out companies" established to hire out the services of individual directors who are Guild members. The Guild seeks, in all the ways a union usually does, to protect and advance the interests of its membership, and it is a bona fide labor organization. The other defendants are former or present officers of the Guild.

The Guild concedes that it has engaged in the activities alleged by HBO to violate the antitrust laws. In brief, the Guild has bargained for and signed certain standardized agreements, with companies that produce programs for pay television ("signatories"), that specify the terms on which directors may provide their services. The two key Guild agreements are the Freelance Live and Tape Television Agreement of 1978 (the "Freelance Agreement"), Pl.Ex. 38, and the Basic Agreement of 1978 (the "Basic Agreement"), Def.Ex. 48 (integrated version of 1973 Basic Agreement, Pl.Ex. 42,

---

1. In 1947, the television networks recognized the Radio Directors Guild as the collective bargaining representative of television staff directors and associate directors. In 1952, after the Radio Directors Guild changed its name to the Radio and Television Directors Guild, the major networks recognized it as the collective bargaining representative of staff and freelance television and radio directors, as well as of other categories of employees. Def.Exs. 12, 13, 21, 27, 29, 30; Gordon Tr. 1608.

and 1978 changes, Pl.Ex. 41). The Freelance Agreement is the Guild's agreement for live programs and those recorded on videotape; the Basic Agreement is the Guild's agreement for motion pictures and television programs recorded on film. The Guild sought such agreements with all production companies, including HBO, and has repeatedly used its authority over its members to prevent their working as directors on programs intended for pay television and produced by companies that have not signed a Guild agreement ("nonsignatories").

HBO challenges the Guild's conduct and agreements on several grounds. HBO contends that certain Guild members—freelance directors, producer-directors, and director-packagers—are independent contractors or entrepreneurs and therefore may not lawfully combine to restrain the sale of their services. HBO also attacks the Guild's agreements with "loan-out companies"—companies that are owned by Guild directors and whose only business is to provide their owners' services to production companies. HBO alleges that those agreements, which forbid the sale of directors' services to nonsignatories, are an unlawful restraint on the market in directors' services. Finally, HBO asserts that the Guild's agreements with production companies operate unlawfully to restrain competition in the market for television programs.

The Guild contends in response that its actions and agreements are exempt from the antitrust laws. The Guild argues that its combinations with freelance directors, individually or through loan-out companies, with producer-directors, and with director-packagers are protected by the "statutory" exemption afforded unilateral labor activity. The Guild also contends that its agreements with production companies, including those owned by director-packagers, are exempt from the antitrust laws under the judicially developed "nonstatutory" exemption. Finally, the Guild asserts that its actions and agreements, even if not exempt, do not constitute an unreasonable restraint on trade and hence do not violate the Sherman Act.

The case was tried to the Court from March 10 to March 27, 1980. Thereafter, the parties engaged in extensive briefing. Based on the findings of fact and conclusions of law set forth below, plaintiff has failed to establish any proper ground for enjoining the Guild's activities.

## I. Factual Background

HBO's difficulties with the Guild stem from a relationship commencing at the very beginning of pay television. Guild contracts with production companies, networks, and other signatories have recognized since at least 1965 that pay television was a subject for future collective bargaining over wages and other terms and conditions of employment. The 1965 network agreement required any signatory that intended to produce a program for "initial release in home pay television" to notify the Guild prior to production. The agreement provided that the Guild and the signatory would then bargain and that, failing agreement on the terms of compensation for such work, the Guild could terminate the entire agreement. Def.Ex. 38 at 28. Similar provisions exist in the current Basic Agreement and in the Freelance Agreement, except that now the Guild has only the power to instruct its members to refuse to render services with respect to pay-television programs rather than the power to terminate the entire agreement. In 1970, Guild members were specifically advised of the requirement that their terms of compensation for work on programs intended for primary use on pay television were subject to negotiation. They were told to inform the Guild before rendering any services in connection with productions intended for any use other than exhibition on commercial (or "free") television. Def.Ex. 117.

The Guild has had much more definitive agreements concerning reruns and other subsequent use on pay television of programs produced primarily for exhibition on free television or in motion-picture theaters. Compensation for reruns on pay television has been governed by the "supplemental market" provisions of the Guild's collective

bargaining agreements. Those provisions grant the director and other Guild employees who work on a program additional compensation for supplemental use aggregating 1.2% of the gross receipts obtained by the signatory from such supplemental exhibitions. Pl.Ex. 39 at 79–98; Def.Ex. 44 at 117–33; Franklin Tr. 1234–35. In the event that the signatory sells or licenses its television rights in a program, the agreements provide that the signatory is absolved from its responsibility to pay additional compensation for reruns if it obtains from the buyer or licensee a separate assumption agreement for the express benefit of the Guild and its members. *See* Pl.Ex. 38 at 32–34.

The Guild has never had a collective bargaining agreement with HBO, although HBO has employed Guild members in its own productions since at least 1973. The Guild initially permitted this activity, even though HBO's wages to directors were below the levels agreed on by the Guild and its signatories. The Guild apparently also permitted its members to work on projects produced by signatory companies, but intended for exhibition by HBO, on the terms generally applicable under Guild agreements. Witnesses at the trial convincingly testified that the Guild's waiver of its requirement that members work only for signatories was aimed at enabling HBO (and pay television generally) to become established.[2] In 1975 and 1976, Guild representatives met with HBO personnel to obtain information concerning HBO's growth and operations. In 1977, HBO entered into a collective bargaining agreement with the American Federation of Television and Radio Artists (AFTRA), at roughly 80% of network rates. The Guild thereupon proposed that HBO become a signatory to the Freelance Agreement. HBO rejected the request, refusing to pay network rates, and sought instead an agreement at lower rates.

During 1978, the Guild withdrew its proposal and revised its demands. Acting on the advice of Michael Franklin, its newly appointed National Éxecutive Secretary, the Guild demanded the greater of the network prime-time rate and a certain percentage of the revenues derived from pay television's exhibition of each program. Franklin was convinced that, due to ease of transmission plus relatively fixed distribution costs, pay television would have far higher returns than free television or theaters, and he urged an effort to secure for Guild members a greater share of the anticipated return. Franklin Tr. 1074–79. Percentage-of-gross provisions had previously been obtained by unions (including the Guild) with respect to supplemental uses of entertainment programs. But no entertainment union other than the union representing stage directors and choreographers had succeeded in negotiating compensation for its members based on a percentage of gross receipts from primary uses. Pl.Ex. 129; Franklin Tr. 978–88, 1075–76; Wolff Tr. 403–04.

HBO rejected the Guild's new proposal. It regarded the percentage-of-gross provision as unprecedented, unacceptable, and in any event unworkable as applied to HBO, which charges customers a monthly, rather than a per-program, fee. On May 18, 1978, the Guild announced to its members that it had decided thenceforth to enforce its constitution's prohibition against working for nonsignatories in pay television.[3] It specifi-

---

**2.** The Guild requires its members to insist that their employers undertake to comply with the Basic and Freelance Agreements. Pl.Ex. 27 at 4 (Guild constitution and by-laws, art. III, § H8). No member is permitted to "waive any of the pay, provisions, or working conditions of any Guild agreement" or "to accept employment below minimums" or to "work with non-signatories." *Id.* at 17–18 (art. IX, § B3–B5). Article X of the Guild's constitution and by-laws authorizes the Guild to censure, fine, suspend, or expel members for violations of these prohibitions. *Id.* at 18–19.

**3.** The letter informed Guild members that HBO had "refused to negotiate a contract with the Guild" and warned that, under threat of disciplinary action, they "may *not* accept employment . . . in any Guild category" with HBO and must report "any employment proposal with *any other* production company which may involve a program intended for use by Home Box Office." Pl.Ex. 43 (emphasis in original). The threat of the May 18 letter was repeated in

cally informed its members that they could no longer work for HBO, either individually or through their loan-out companies,[4] and threatened disciplinary action. Pl.Ex. 43. Finally, the letter forbad members who were also packagers to furnish packaged programs to nonsignatories such as HBO, a position from which the Guild has since retreated, following the issuance by the NLRB of a complaint. *See* Pl.Exs. 21, 45, 46, 52, 62, 78, 83, 88–93, 102, 130. Shortly after the Guild's letter, HBO proposed an agreement similar to the agreement it had reached with AFTRA, but the Guild rejected the proposal. This lawsuit was filed on July 10, 1978.

Negotiations between HBO and the Guild resumed in September 1978 and continued intermittently until February 1979. HBO sought compensation levels below the rates set in the Freelance Agreement and rejected entirely the notion of percentage compensation for use of such film in its primary market. The Guild, on the other hand, insisted on network rates plus some additional compensation, either in the form of a percentage of gross receipts or in a form measured by HBO's subscriber growth.

Meanwhile, the Guild began to negotiate new forms of arrangements with production companies desiring to make programs for pay television; it also began to enforce

its prohibition against Guild members who worked for HBO or other nonsignatories on pay-television programs. The Guild prepared what it termed a Special Amendment to the Freelance and Basic Agreements. The Special Amendment requires all signatories to do several things: to pay Guild directors who work on programs for pay television the higher of the prime-time network rate of 4% of the gross revenues obtained from licensing the program; to transfer the right to exhibit such films on pay television for no more than one year; and to obtain from every licensee, buyer, or other transferee of exhibition rights a commitment (called an Assumption Agreement) to assume the signatory's compensation- and exhibition-related obligations to the Guild. Several independent companies producing programs for television have reached agreements with the Guild that modify the Special Amendment in important ways—among them, by substituting a security assignment for the Assumption Agreement.

At the same time, the Guild enforced its constitution's prohibition against its members' working for nonsignatories. Several members were warned emphatically against working for HBO or for any other nonsignatory in the pay-television field.[5] Others

letters dated June 21, 1978, and August 25, 1978. Pl.Exs. 44, 45. In addition, the Guild issued warnings against working in a Guild capacity for any nonsignatory in its newsletters of April 1978, Pl.Ex. 48 at 6, of September 1978, Pl.Ex. 49 at 6, of December 1978, Pl.Ex. 50 at 1, 6 (noting in particular that HBO is a nonsignatory), and of July 1979, Pl.Ex. 52 at 6, 8 (same). The newsletters of December 1978 and of February 1979 directly warn, "Do not work for these nonsignatory companies," and list HBO as a nonsignatory. Pl.Ex. 50 at 1; Pl.Ex. 51 at 1.

**4.** The May 18, 1978 letter prohibited "employment (either directly or through *your own loan-out company*) in any Guild category with Home Box Office" and noted that the prohibition applied even to signatory loan-out companies. Pl.Ex. 43. The same warnings were repeated in letters of June 21, 1978, and August 25, 1978. Pl.Exs. 44, 45. A letter dated August 29, 1978, reminded Guild members that the pay-television bargaining provision of the Freelance Agreement applied to loan-out compa-

nies. Pl.Ex. 46. And the Guild newsletters of April 1978, December 1978, and July 1979 all contain warnings that loan-out companies may not lend Guild member services to nonsignatories such as HBO. Pl.Ex. 48 at 2, 5, 6; Pl.Ex. 50 at 6; Pl.Ex. 52 at 6. In December 1978 the Guild initiated disciplinary action against Joshua White, who it believed was "employed as a director, either directly or on a loan-out basis, by Home Box Office." Pl.Ex. 58. White was found guilty and fined in 1979. Pl.Ex. 34.

**5.** All of the Guild's warnings to free-lance directors were based on article II, section H8, and article IX, sections B3–B5, of the Guild constitution and by-laws. *See* Pl. Ex. 27. Between November 1978 and March 1979, for example, Michael Franklin sent letters to Dwight Hemion, Josef Bernay, Lee Gabler, Michael Ovitz, Jerome Katzman, and Richard Goldstone, advising them that no Guild member may work for nonsignatories such as HBO. Pl. Exs. 53–55, 62–64. The seriousness of the Guild's efforts is further evidenced by a memorandum

were disciplined; at times through the imposition of substantial fines.[6] The Guild even sought investigations and preventive action by the Immigration and Naturalization Service to disable aliens from entering the United States to work for HBO as directors. Pl.Exs. 56–57. In short, the Guild has since 1978 made determined efforts to prevent its freelance director members from working in Guild capacities for any nonsignatory production company, including HBO. It is only the lawfulness, not the existence, of those efforts that is contested.

## II. *The Governing Law*

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1 (1976). Much collective labor activity falls within this prohibition. *See Allen Bradley Co. v. Local 3, International Brotherhood of Electrical Workers*, 325 U.S. 797, 801–03, 65 S.Ct. 1533, 1536–1537, 89 L.Ed. 1939 (1945). But Congress has enacted several statutes restricting both the applicability of the Sherman Act to labor and the power of federal courts to enjoin labor activity. Based on those statutes and on the policies embodied in the federal labor laws, the courts have fashioned two labor exemptions from the antitrust laws—the "statutory" and "nonstatutory" exemptions. *See Connell Constr. Co. v. Plumbers & Steamfitters Local 100*, 421 U.S. 616, 621–22, 95 S.Ct. 1830, 1834–1835, 44 L.Ed.2d 418 (1975). Union conduct that falls within either exemption is immunized from challenge under the Sherman Act.

The labor-antitrust exemptions are based on several statutes enacted by Congress in the wake of judicial decisions holding labor conduct violative of the Sherman Act. *See United States v. Hutcheson*, 312 U.S. 219, 229–31, 61 S.Ct. 463, 464–465, 85 L.Ed. 788 (1941). Section 6 of the Clayton Act, adopted in 1914, states:

The labor of a human being is not a commodity or article of commerce. Nothing contained in the antitrust laws shall be construed to forbid the existence and operation of labor ... organizations, instituted for the purposes of mutual help, ... or to forbid or restrain individual members of such organizations from lawfully carrying out the legitimate objects thereof; nor shall such organizations, or the members thereof, be held or construed to be illegal combinations or conspiracies in restraint of trade, under the antitrust laws.

15 U.S.C. § 17 (1976). The same Congressional enactment restricts the equitable powers of federal courts over conduct in the course of a labor dispute. Section 20 of the Clayton Act requires a burdensome showing to justify issuing any injunction against actions taken in a dispute over the "terms or conditions of employment," and it unqualifiedly forbids federal courts from enjoining specified activities, including concerted refusals to work. The section also reiterates the declaration of section 6 that certain specified activities do not violate any federal law. 29 U.S.C. § 52 (1976).

In the 1920s the Supreme Court read the Clayton Act to apply only to union activities directed against an employer by its own

dated January 19, 1979, from Franklin to the Assistant Directors Unit Production Managers Council West, which reports that on January 13, 1979, the Guild's National Board requested that the Council West "strictly enforce disciplinary actions against members who are found guilty of working for non-signatory companies." Pl. Ex. 67.

6. In September 1978, Franklin wrote to Tim Kiley that he was informing the Directors Council that Kiley had worked for a nonsignatory as a director on a pay-television program. Pl.Ex. 75. The Guild instituted disciplinary

proceedings against Charles Braverman in December 1978, charging him with having worked as a director for a nonsignatory production company. Pl.Ex. 91. The Guild fined Braverman $13,804.00. Pl.Exs. 92, 93. In the same month, Franklin told Donald Davis that he may not work for Showtime (a pay-television company), and Davis consequently rejected Showtime's offer of employment. Pl.Ex. 68. Joshua White also was the subject of a Guild warning, disciplinary proceeding, and fine. Pl.Exs. 58–61.

employees. *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 41 S.Ct. 172, 65 L.Ed. 349 (1921). Congress therefore enacted the Norris-LaGuardia Act in 1932, restricting even further the power of federal courts to issue any injunction in a case growing out of a "labor dispute," and forbidding the issuance of an injunction contrary to the "public policy of the United States," declared to approve the efforts of workers to organize and bargain collectively. 29 U.S.C. §§ 101 & 102 (1976). In addition, Section 4 of the Act places many specific types of labor activity beyond the jurisdiction of federal courts to enjoin, including:

(a) Ceasing or refusing to perform any work or to remain in any relation of employment;

(b) Becoming or remaining a member of any labor organization or of any employer organization, regardless of any ["yellow dog" contract];

. . . .

(g) Advising or notifying any person of an intention to do any of the acts heretofore specified;

(h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and

(i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified, regardless of any ["yellow dog" contract].

29 U.S.C. § 104 (1976). Finally, section 5 states the Act's intended effect with respect to the antitrust laws. It provides that no injunction may issue on the ground that "any of the persons participating or interested in a labor dispute constitute or are engaged in an unlawful combination or conspiracy because of the doing in concert of the acts enumerated" in section 4.

In the Wagner, or National Labor Relations Act of 1935 ("NLRA"), Congress expanded the organizational rights of labor. Employees were expressly accorded the rights to organize, to bargain collectively, and to engage in concerted actions. Employers were forbidden to interfere with those rights. 29 U.S.C. §§ 157, 158, 163 (1976). The National Labor Relations Board ("NLRB") was established to regulate labor-management activities.

In the Labor Management Relations Act of 1947 ("LMRA") and in the Labor Management Reporting and Disclosure Act of 1959 ("LMRDA"), Congress prohibited various labor practices and thereby sowed the seeds of the great complexities involved in labor-antitrust law. The LMRA prohibited unions from, among other things, causing employers to discriminate, engaging in certain forms of "secondary" boycotts, and using secondary pressure to enforce lawful "hot cargo" operations. The LMRDA made it unlawful to threaten or coerce secondary employers and outlawed all hot cargo agreements except in the garment and construction trades. These restrictions on labor activities have provided a basis for affording far more leeway to antitrust enforcement, even though no legislative history suggests that the labor-law restrictions were intended by Congress to free courts to apply antitrust law as well. *See Connell Constr. Co. v. Plumbers & Steamfitters Local 100, supra*, 421 U.S. at 634–35, 95 S.Ct. at 1840–1841; *id.* at 638–55, 95 S.Ct. at 1842–1851 (Stewart, J., dissenting).

In attempting to reconcile the competing policies embodied in the antitrust and labor laws, the federal courts have relied in part on the federal labor policy expressed in the NLRA and its amendments. That policy recognizes unorganized labor's disadvantage in bargaining power and promotes collective bargaining as the proper means for resolving disputes over terms of employment. 29 U.S.C. § 151 (1976). It is in light of this policy, designed "to equalize before the law the position of workingmen and employer as industrial combatants," *Duplex Printing Press Co. v. Deering, supra*, 254 U.S. at 484, 41 S.Ct. at 182–183, that the labor-antitrust exemptions have been judicially defined. On the other hand, the courts have found in the more recent labor statutes, and in antitrust policy, reasons for subjecting labor activities to antitrust proscription.

Modern labor-antitrust law divides the problems in the field into two distinct groups. In one group are the problems presented by antitrust challenges to unilat-

eral labor activity; in the second are the problems presented by antitrust challenges to labor combinations with nonlabor persons or entities. In cases challenging unilateral labor activity, the Court applies the "statutory" exemption from the antitrust laws; in cases challenging combinations with nonlabor entities, the Court applies the "nonstatutory" labor-antitrust exemption. Both exemptions limit the scope of antitrust law's prescriptions by reference to labor law's protection of a broad range of concerted labor activity.

### A. The Statutory Exemption for Unilateral Activity

In *United States v. Hutcheson, supra*, the Supreme Court announced that the Sherman, Clayton, and Norris-LaGuardia Acts must be read as a single "harmonizing text" to define labor's exemption from the antitrust laws, 312 U.S. at 231, 61 S.Ct. at 465–466, and defined the statutory exemption as follows:

> So long as a union acts in its self-interest and does not combine with non-labor groups, the licit and the illicit under § 20 [of the Clayton Act] are not to be distinguished by any judgment regarding the wisdom or unwisdom, the rightness or wrongness, the selfishness or unselfishness of the end of which the particular union activities are the means.

*Id.* at 232, 61 S.Ct. at 466 (footnote omitted). Any labor action passing the test is not only immune from injunction but also exempt from the Sherman Act for purposes of any other remedy sought for an antitrust violation. *Id.* The two-part *Hutcheson* test—has the union acted in its self-interest and apart from any non-labor group?—remains the governing test for whether labor actions fall within the statutory exemption from the antitrust laws. *See H. A. Artists & Assoc., Inc. v. Actors' Equity Ass'n*, 451 U.S. 704, 101 S.Ct. 2102, 2109, 68 L.Ed.2d 558 (1981).

Several Supreme Court cases have examined whether particular labor actions are exempt from the antitrust laws as unilateral and self-interested. Prior to *Hutcheson*,

the Court held in *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940), that a union's violent takeover of a factory and subsequent sit-down strike are exempt from antitrust challenge because the Norris-LaGuardia and National Labor Relations Acts permit the "elimination of price competition based on differences in labor standards." *Id.* at 503, 60 S.Ct. at 997. The pre-*Hutcheson* Court also upheld a union's secondary activity against antitrust challenge. In *Milk Wagon Drivers Local 753 v. Lake Valley Farm Products, Inc.*, 311 U.S. 91, 61 S.Ct. 122, 85 L.Ed. 63 (1940), the union picketed retailers to pressure milk wholesalers to accept the union's proposal for the terms on which the wholesalers could use independent-contractor vendors, rather than union drivers, to deliver milk; the union sought as well to induce the vendors to join that union, rather than a rival union the vendors had organized, and to abandon their independent contracting arrangement with the wholesalers. The Court held that, although the union activity was secondary in nature and the conflict included a controversy between two unions, the picketing grew out of a labor dispute and was therefore exempt from injunction under the Norris-LaGuardia Act. *Id.* at 96–103, 61 S.Ct. at 124–128.

In *Hutcheson, supra*, the Court refused to permit "conventional, peaceful activities" (a refusal to work, picketing, and a boycott), undertaken by one union in a controversy with a rival union, to be punished as criminal violations of the Sherman Act. 312 U.S. at 227, 61 S.Ct. at 464. Thereafter, in *Hunt v. Crumboch*, 325 U.S. 821, 65 S.Ct. 1545, 89 L.Ed. 1954 (1945), the Court found exempt a union's refusal to admit a company's employees to membership and its refusal to sell its members' services to the company. The union's actions put the company out of business, and the company alleged that the "refusal to accept employment was due to personal antagonism against the [company] arising out of the killing of a union man." *Id.* at 824, 65 S.Ct. at 1547. The Court held, however, that the statutory exemption recognized in *Hutcheson* accorded employees "an absolute right . . . to

work or cease working according to their own judgments" as long as the "only combination . . . [is] one of workers alone." *Id.* at 824, 825 n.1, 65 S.Ct. 1547 n.1.

In *Local 24, International Brotherhood of Teamsters v. Oliver*, 358 U.S. 283, 79 S.Ct. 297, 3 L.Ed.2d 312 (1959) *("Oliver I")*, the Supreme Court declared that federal labor policy protects from regulation by state antitrust laws a collective bargaining agreement between the Teamsters union and several motor carriers that set minimum rental fees when a carrier leased a truck owned by its driver. The Court observed that the union's objective was to protect its member-drivers' wage scale from being undermined by the lessor-drivers. Moreover, the Court found that the union had acted unilaterally, even though the owner-drivers were entrepreneurs. The union could lawfully regulate their terms of employment, the Court held, because those terms were "of vital concern to the carrier's employed drivers." *Id.* at 294, 79 S.Ct. at 304. In *Local 24, International Brotherhood of Teamsters v. Oliver*, 362 U.S. 605, 80 S.Ct. 923, 4 L.Ed.2d 987 (1960) *("Oliver II")*, the Court referred back to *Oliver I* to uphold the union's requirement that carriers use their own employees, if available, to drive leased trucks and that they use their own trucks, if available, rather than lease.

A clear instance of nonunilateral action was presented in *Los Angeles Meat & Provision Drivers Union v. United States*, 371 U.S. 94, 83 S.Ct. 162, 9 L.Ed.2d 150 (1962). Independent-contractor grease peddlers had combined with a union to enhance their bargaining power. The Court held that the independent contractors could be divested of union membership, because "sellers of commodities" could not immunize their conduct by calling themselves collectively a union. *Id.* at 102, 83 S.Ct. at 166. The Court added, however, that "a labor organization might . . . often have a legitimate interest in soliciting self-employed entrepreneurs as members. . . . But here . . . there was no job or wage competition or economic interrelationship of any kind between the grease peddlers and other members of the . . . union." *Id.* at 103, 83 S.Ct. at 167.

The Supreme Court soon made clear that *Meat Drivers* did not presage any absolute prohibition of combinations between unions and independent contractors or entrepreneurs. In *American Federation of Musicians v. Carroll*, 391 U.S. 99, 88 S.Ct. 1562, 20 L.Ed.2d 460 (1968), band leaders challenged the regulations of the musicians' union governing, among other things, the minimum prices that the leaders could charge for "club dates." The Supreme Court held that the regulation, though a direct price restraint, fell within the statutory exemption. The leaders were independent contractors, even entrepreneurs. But they nevertheless constituted a labor group because there was " 'job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors.' " *Id.* at 106, 88 S.Ct. at 1567 (quoting *Carroll v. American Federation of Musicians*, 241 F.Supp. 865, 887 (S.D.N.Y. 1965)). The band leaders competed with union-member musicians for shares in the fee charged for a club date, so regulation of the club-date fees was necessary to protect the wages and job security of musicians in the band. 391 U.S. at 110–13, 88 S.Ct. at 1569–1571.

The Supreme Court recently reaffirmed the *Carroll* principle in *H. A. Artists & Assoc., Inc. v. Actors' Equity Ass'n, supra.* The Court reiterated the warning in *Hutcheson* that "a party seeking refuge in the statutory exemption must be a bona fide labor organization, and not an independent contractor or entrepreneur." 101 S.Ct. at 2110 n.20. Yet the Court rejected a challenge by agents for stage actors to a system by which the actors' union licensed the agents and regulated the fees the agents could charge. The agents were independent contractors and did not even compete with actors for jobs or wages. But the facts came within the "other economic interrelationship" branch of the *Carroll* standard, because the agents greatly influenced, even controlled, actor access to jobs and, as a result, could easily undermine pro-

ducer compliance with the wage structure established by the actors' union and producers. 101 S.Ct. at 2111–12.

■ Thus, not all combinations of unions with entrepreneurs or independent contractors fall outside the statutory exemption. The second part of the *Hutcheson* requirement of unilateral conduct authorizes a broad interpretation of "labor group." Even though a challenged combination includes independent contractors or entrepreneurs, it may come within the statutory exemption if the non-employee parties to the combination are in job or wage competition with the employee parties, or in some other economic interrelationship that substantially affects the legitimate interests of the employees.

### B. The Nonstatutory Exemption for Combinations with Nonlabor Groups

The nonstatutory exemption for labor actions in combination with nonlabor groups has been squarely addressed by the Supreme Court on only four occasions since the 1930s. Those cases, moreover, do not spell out a standard of the sort articulated in *Hutcheson* and interpreted in *Carroll*; each case was decided fairly narrowly on its facts. Nonetheless, the opinions in those cases, as well as those in related Supreme Court decisions, define at least the contours of the nonstatutory exemption.

The Court first confronted the problems presented by an antitrust challenge to a labor-nonlabor combination in *Allen Bradley Co. v. Local 3, Electrical Workers, supra*. The Court recognized that such a combination raised different antitrust problems from those raised by unilateral labor actions. When labor does not act alone, said the Court, "we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining." 325 U.S. at 806, 65 S.Ct. at 1538. *Allen Bradley* involved a combination of contractors and manufacturers that included several hot cargo agreements; the combination "[q]uite obviously ... violated both §§ 1 and 2 of the Sherman Act, unless ... immunized by the participation of the union." *Id.* at 800, 65 S.Ct. at 1535 (footnote omitted). The Court assumed that no antitrust liability would attach to the union's agreements if made individually with contractors in a collective bargaining relationship. *Id.* at 809, 65 S.Ct. at 1539–1540. But the law provides no exemption, said the Court, to a union that joins a combination of businesses violating the Sherman Act. *Id.* at 811, 65 S.Ct. at 1540–1541.

In *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), the Court reiterated the observation in *Allen Bradley* that the *Hutcheson* exemption for unilateral action does not cover union-employer agreements, not even collective bargaining agreements and agreements concerning wages. *Id.* at 662–63, 85 S.Ct. at 1589–1590. The Court went on to explain the contours of the nonstatutory exemption. A union agreement on prices, for example, is not exempt because the restraint on the product market is "direct and immediate" and gives the union "nothing more concrete than the hope for better wages to come." *Id.* at 663, 85 S.Ct. at 1590. By contrast, a union's collective bargaining agreement on wages, even with a multi-employer bargaining unit, is exempt because the benefit to the union is "direct and concrete" and any effect on the product market results from the elimination of wage competition among the employers in the unit. *Id.* at 664, 85 S.Ct. at 1590 (citing *Apex Hosiery Co. v. Leader, supra*, 310 U.S. at 503–04, 60 S.Ct. at 997–998).

Although not all collective bargaining agreements concerning mandatory subjects of bargaining fall within the nonstatutory exemption, the National Labor Relations Board's demarcation of the scope of mandatory bargaining "has great relevance" to the task of harmonizing labor and antitrust policies. 381 U.S. at 664–65, 85 S.Ct. at 1590–1591. Federal labor policy, however, does not protect collective bargaining agreements in which the union commits it-

self to a bargaining position in other bargaining units. Even if the union seeks by the agreement to standardize wages, hours, or other working conditions, "[o]ne group of employers may not conspire to eliminate competitors from the industry and the union is liable with the employers if it becomes a party to the conspiracy." *Id.* at 665–66, 85 S.Ct. at 1590–1591. The Court in *Pennington* therefore held nonexempt a collective bargaining agreement between the mineworkers' union and the major coal companies that obligated the union to insist on uniform wages in negotiations with coal companies outside the bargaining unit, where the purpose and effect of the agreement was to drive some smaller companies out of business.

■ *Local 189, Amalgamated Meat Cutters & Butcher Workmen v. Jewel Tea Co.,* 381 U.S. 676, 85 S.Ct. 1596 (1965), a companion case to *Pennington,* is the only case in which the Supreme Court has found a challenged union-employer agreement within the nonstatutory exemption. The plurality opinion by Justice White (joined by Chief Justice Warren and Justice Brennan) announced what has been accepted in the Second Circuit as the general standard defining the nonstatutory exemption · for union-employer agreements. The issue is whether the subject of a restriction,

> like wages, and unlike prices, is so intimately related to wages, hours and working conditions that the unions' successful attempt to obtain that provision through bona fide, arm's-length bargaining in pursuit of their own labor union policies, and not at the behest of or in combination with nonlabor groups, falls within the protection of the national labor policy and ·is therefore exempt from the Sherman Act.

*Id.* at 689–90, 85 S.Ct. at 1601–1602 (footnote omitted). *See Berman Enterprises Inc. v. Local 333, United Marine Division, ILA,* 644 F.2d 930, 935 n.8 (2d Cir.), *cert. denied,* —— U.S. ——, 102 S.Ct. 506, 70 L.Ed.2d —— (1981) (adopting quoted standard). Justice White added: "The crucial determinant is not the form of the agree-

ment—*e.g.,* prices or wages—but its relative impact on the product market and the interests of union members." 381 U.S. at 690 n.5, 85 S.Ct. at 1602 n.5. An opinion by Justice Goldberg (joined by Justices Harlan and Stewart) recommended even broader protection, arguing that any collective bargaining agreement on a mandatory subject was exempt from the antitrust laws. *Id.* at 710, 85 S.Ct. at 1614.

*Jewel Tea* held that marketing-hours and working-hours restrictions fell within the nonstatutory exemption. Hours of work are a mandatory subject of bargaining. *Id.* at 699–700, 85 S.Ct. at 1608–1609; *id.* at 691, 85 S.Ct. at 1602–1603 (opinion by White, J.) For Justices Goldberg, Harlan, and Stewart, the mandatory nature of the subject was conclusive; for Justices White and Brennan, and for Chief Justice Warren, the mandatory nature of the subject "weigh[ed] heavily" in the balance, *id.* at 689, 85 S.Ct. at 1601, and the balance tipped in favor of exemption because, although restrictions on working hours have an "apparent and real" effect on competition, the "concern of union members is immediate and direct," *id.* at 691, 85 S.Ct. at 1603. The marketing-hours restriction was exempt for similar reasons. The opinion by Justice Goldberg treats it as a mandatory subject and hence exempt. 381 U.S. at 699–700, 85 S.Ct. at 1608–1609 (opinion by Goldberg, J.). The opinion by Justice White notes that the trial court had found that the provision preserved work for and protected the working-hours restrictions of the union members. The marketing-hours restriction therefore was "a subject of immediate and legitimate concern to union members," *id.* at 692, 85 S.Ct. at 1603 (opinion by White, J.), and, for that reason, came within the nonstatutory exemption.

The final case in which the Supreme Court has discussed the boundaries of the nonstatutory exemption is *Connell Constr. Co. v. Plumbers & Steamfitters ·Local 100, supra,* 421 U.S. 616, 95 S.Ct. 1830, 44 L.Ed.2d 418 (1975). The Court observed that the nonstatutory exemption rests on national labor policy's protection of efforts

by employees to eliminate employer competition based on differences in wages, hours, and working conditions. *Id.* at 622, 95 S.Ct. at 1835. With that policy in mind, the Court held outside the nonstatutory exemption an agreement between a union and a construction contractor that prohibited the contractor's use of any subcontractor with which the union had no collective bargaining agreement. The agreement was not a collective bargaining agreement and was not restricted to work to be performed at a particular jobsite; it banned the use of nonunion subcontractors indiscriminately, without regard to whether competition among subcontractors was based on differences in wages, hours, or working conditions; and it violated labor law's prohibition on hot cargo agreements. 29 U.S.C. § 158(e) (1976). In those circumstances, said the Court,

> [t]his kind of direct restraint on the business market has substantial anticompetitive effects, both actual and potential, that would not follow naturally from the elimination of competition over wages and working conditions. It contravenes antitrust policies to a degree not justified by congressional labor policy, and therefore cannot claim a nonstatutory exemption from the antitrust laws.

*Id.* at 625, 95 S.Ct. at 1836.

All four Supreme Court cases defining the nonstatutory labor-antitrust exemption recognize that the purpose of the exemption is to reconcile conflicting national policies— one protecting business competition, the other encouraging collective bargaining as the means to "the friendly adjustment of industrial disputes arising out of differences as to wages, hours, or other working conditions, and [the restoration of] equality of bargaining power between employers and employees." 29 U.S.C. § 151 (1976). *Allen Bradley, Pennington,* and *Connell* must be viewed, however, as bearing on problems different from those to which *Jewel Tea* applies. Thus, although the *Connell* Court focused closely on the substantial effects of the challenged agreement on business competition, it did so in the absence of any collective bargaining relationship that could even arguably have provided shelter for the agreement under federal labor policy. Moreover, the *Connell* Court stressed that the anticompetitive effects of the agreement did not "follow naturally from the elimination of competition over wages and working conditions," that is, from union efforts to standardize the terms of employment. *Connell Constr. Co. v. Plumbers & Steamfitters Local 100, supra,* 421 U.S. at 625, 95 S.Ct. at 1836. *Pennington* invalidated a union-employer agreement reached through collective bargaining. But the Court emphasized that the agreement committed the union to a negotiating position outside the bargaining unit, in part to confer anticompetitive benefits on the employer parties. Similarly, the combination invalidated in *Allen Bradley* involved an unlawful employer conspiracy even without the union's participation, and the union's relationship with the employers had none of the adversarial character normally associated with collective bargaining. Finally, all three cases involved agreements with clear, substantial, and intended anticompetitive effects in the business market—well within the proscriptions of the policies embodied in the antitrust laws— and no claim to protection under the national labor policy. *Pennington* and *Connell,* in particular, evidence federal labor law's profound commitment to the individual, self-contained bargaining unit as the arena for union-employer bargaining, *see United Mine Workers v. Pennington, supra,* 381 U.S. at 666–67, 85 S.Ct. at 1591–1592 (labor law establishes duty to bargain unit by unit); *Connell Constr. Co. v. Plumbers & Steamfitters Local 100, supra,* 421 U.S. at 626–35, 95 S.Ct. at 1837–1841 (labor law prohibits challenged hot cargo agreement, which uses one employer to extract union benefits from other employers), a commitment reflected in the NLRA's prohibitions on certain secondary activity, including hot cargo agreements. *E.g.,* 29 U.S.C. § 158(b)(4), (e) (1976).

*Jewel Tea,* by contrast, is the only one of the four Supreme Court cases on the nonstatutory exemption that involves a collec-

tive bargaining agreement whose terms concern only the bargaining unit and that resulted from arm's-length, *i.e.*, adversarial, bargaining. The agreement challenged in *Jewel Tea* resulted from the union's arm's-length efforts to standardize the wages, hours, or working conditions of its members in the bargaining unit, in the sense that "the circumstances of its negotiation [were] such that it can be said that the union acted unilaterally, that is, it pursued the agreement in its own self-interest, rather than 'at the behest of or in combination with non-labor groups.'" Handler & Zifchak, *Collective Bargaining and the Antitrust Laws: The Emasculation of the Labor Exemption,* 81 Colum.L.Rev. 459, 485 (1981) (quoting *Jewel Tea, supra,* 381 U.S. at 690, 85 S.Ct. at 1602); *see Intercontinental Container Transport Corp. v. New York Shipping Ass'n,* 426 F.2d 884, 888 (2d Cir. 1970) (agreement within *Jewel Tea* rule because "the union here, acting solely in its own self-interest, forced reluctant employers to yield to certain of its demands"). Moreover, although the restrictions imposed on employees in *Jewel Tea* had a substantial effect on the product market, their purpose was strongly supported by federal labor policy, because wages, hours, and working conditions in the relevant unit are mandatory subjects of bargaining. *See* 381 U.S. at 689, 85 S.Ct. at 1601 (opinion by White, J.); *id.* at 710, 85 S.Ct. at 1614 (Goldberg, J., concurring); *United Mine Workers v. Pennington, supra,* 381 U.S. at 664–65, 85 S.Ct. at 1590–1591. *But cf. Connell Constr. Co. v. Plumbers & Steamfitters Local 100, supra,* 421 U.S. at 622–26, 95 S.Ct. at 1835–1837 (finding agreement outside nonstatutory exemption before considering legality under NLRA).

The essence of *Jewel Tea* is that a single national policy that harmonizes antitrust and labor policies cannot sensibly provide for antitrust liability for union-employer agreements that are the result of precisely the sort of arm's-length bargaining—especially over mandatory subjects—that federal labor policy authorizes. *See* 1 P. Areeda & D. Turner, *Antitrust Law* ¶ 229, at 192 (1977) ("There seems little warrant in labor law or policy for distinguishing most collective bargaining agreements from unilateral union activities producing the same result. When a strike is exempt in pursuit of certain goals, the embodiment of those goals in a collective bargaining agreement should also be exempt." (footnote omitted)); Handler & Zifchak, *supra,* at 478–79 (*Hutcheson* should be read as holding that if a union's coercive conduct is immune from antitrust liability and protected by labor law, "an employer's commitment to the same effect that directly results from the union's coercion" should also be immune).

Recent Second Circuit decisions seem in accord with these views, broadly exempting from antitrust liability union-employer agreements sanctioned by labor policy. Thus, in *Berman Enterprises Inc. v. Local 333, Union Marine Division, ILA, supra,* the Court of Appeals upheld a collective bargaining agreement that required two workers on certain barges operated by members of the employer's association and that also required "affiliates" of association members to comply with the contract. The challenged provisions of the agreement, said the Court, were designed to improve wages and working conditions and to protect jobs and promote safety. The provisions thus served "legitimate" union objectives and hence satisfied the *Jewel Tea* test. *Id.* at 935 n.8.

In *Jou-Jou Designs, Inc. v. International Ladies Garment Workers Union,* 643 F.2d 905 (2d Cir. 1981), the Second Circuit rejected an antitrust challenge to a Hazantown agreement, the garment-industry analogue of the construction-industry agreement struck down in *Connell.* Whereas the *Connell* agreement finds no protection in the federal labor laws, the same agreements in the garment industry are "'affirmatively sanctioned by labor law,'" in section 8(e) of the NLRA. *Id.* at 909–10 (quoting L. Sullivan, *Handbook of the Law of Antitrust* 730 (1977)). The Court made no inquiry into the anticompetitive effects of the agreement; nor did it seek to balance anticompetitive effects and the union's protected objective of eliminating competition over

wages or working conditions. Although the opinion does not specify what other agreements are likewise so "affirmatively sanctioned by labor law" that their anticompetitive effects have no bearing on whether they come within the nonstatutory exemption, the rule seems likely to apply to collective bargaining agreements negotiated at arm's length, limited to the bargaining unit, and covering subjects of bargaining recognized by statute as fundamental to the interests of unions. Arguably, for example, section 8(e)'s garment-industry proviso creates no stronger or more affirmative authorization for Hazantown agreements than the NLRA creates for arm's-length, bargaining-unit-limited collective bargaining agreements on mandatory subjects. *See, e.g.,* 29 U.S.C. §§ 157 & 158 (1976). Reaching such agreements, after all, is the primary objective of national labor policy. *See* R. Gorman, *Basic Text on Labor Law, Unionization, and Collective Bargaining* 4–5, 399 (1976); H. Wellington, *Labor and the Legal Process* 2 (1968).

### III. *Application of Labor-Antitrust Law to Guild Activities*

HBO challenges the Guild's combination with freelance directors, with loan-out companies, with producer-directors, with director-packagers, and with production companies. Labor-antitrust law's double exemption necessitates a two-part analysis of HBO's challenge to the Guild's conduct. First, it must be determined which of the groups with which the Guild has concededly combined constitutes a labor group and hence is within the protection of *Hutcheson,* as construed by *Carroll.* Second, it must be determined whether the nonstatutory exemption protects the Guild's combinations with groups that fall outside the statutory exemption.

### A. *The Statutory Exemption*

The Guild contends that it has acted in its self-interest, and that freelance directors, loan-out companies, producer-directors, and director-packagers are labor groups under *Hutcheson* and *Carroll,* with whom the un-

ion may consequently combine without antitrust liability. HBO has not contested the Guild's obviously correct contention that the Guild has acted in its self-interest. The Guild is a bona fide labor organization, engaged in a labor dispute with HBO and with other production companies, and has engaged in conduct that would be protected if it were unilateral. HBO argues, however, that the four groups of directors are all independent contractors and, therefore, that the Guild's combination with them falls outside the *Hutcheson* exemption and squarely within the *Allen Bradley* prohibition against combinations with nonlabor groups in restraint of trade.

### 1. *Freelance Directors*

When television began making its own programs in the 1940s, directors were employed by the broadcasting companies. Many directors (approximately 450) continue to be employed by production companies as full-time staff members. These staff directors are employees: they receive a regular salary as well as health and retirement benefits; they work regular hours; they have no direct financial stake in the outcome of the programs on which they work; and they make a controlled and limited, albeit often creative and important, contribution to shaping the content of the films they direct. Early in television's history the pattern of directors' employment began to change. Networks and other production entities, for a variety of reasons, began to employ freelance directors rather than full-time employees for some categories of directorial work; at the same time, some directors, seeking greater creative and financial independence, began to dissociate themselves from employment in staff positions, working instead as freelance directors, usually under individual contracts for particular programs. Today, some 800 of the Guild's 1250 active director members are freelance directors. HBO contends that these freelance directors are independent contractors and for that reason may not claim the labor exemption when engaged in concerted activity with staff directors.

Several characteristics of freelance directors' activities tend to suggest that they are independent contractors in the sale of their services. Freelance directors may accept or reject offers to direct particular shows. They usually contract to work on an individual program rather than for a fixed period. Under Guild agreements, they are paid flat fees for work up to a certain number of days and may accept more than one assignment simultaneously from different employers. They have considerable discretion over who will serve as their assistants, particularly the associate director and technical crew; often these assistants work repeatedly with the same director. Freelance directors also have special skills, based on substantial training and experience. They necessarily have considerable discretion in exercising their skills, working closely with all the talent associated with a show, contributing creatively to all the elements of a show, and working to mold those elements into a coherent whole that has the "look" sought by the individual in charge of the production. A producer may specify the desired result, but the director usually decides initially how that result is to be achieved.

On the other hand, most characteristics of the work performed by freelance directors support the conclusion that they are employees of the production companies for which they work. Freelance directors risk no monetary capital in shows and do not share in any profits, although if the Guild is successful in its aims, directors would receive a percentage of the gross license fee for shows produced for pay television. *Compare Taylor v. Local 7, International Union of Journeymen Horseshoers,* 353 F.2d 593, 599 (4th Cir. 1965), *cert. denied,* 384 U.S. 969, 86 S.Ct. 1859, 16 L.Ed.2d 681 (1966) (farriers at risk in hiring equipment and assistants). Although they receive additional compensation in the event of a rerun or other supplemental use of a program on which they work, that arrangement is similar to those of others in the entertainment industry who unquestionably are employees. Wolff Tr. 386–87; Franklin Tr. 978–88.

Freelance directors working under Guild agreements do not get paid for a defined output. *Compare Bernstein v. Universal Pictures, Inc.,* 517 F.2d 976, 980 (2d Cir. 1975) (composers' status as independent contractors indicated by their being paid for completed song); *see Julien v. Society of Stage Directors and Choreographers, Inc.,* 1975 Trade Cas. ¶ 60541 (S.D.N.Y.1975) (playwrights not employees, for similar reasons). Although freelance directors receive a flat fee for working up to a certain number of days, they receive additional compensation for each additional day of work, are reimbursed for their expenses, and receive fringe benefits. Thus, they are paid neither solely by the job performed nor on a "piece-rate" basis. *Compare Taylor v. Local 7, Journeymen Horseshoers, supra,* 353 F.2d at 600 (fact that farriers paid by job, not by flat fee plus piece rate, tends to support independent contractor characterization). When freelance directors work on network television productions, they are treated as employees for tax purposes: their compensation is subjected to withholding for income and social security taxes and is normally reported on W–2 forms. *Compare id.* (farriers treated as independent contractors by employers). HBO itself paid its freelance directors in that manner until recently, when it sought to affect their legal status by having them and other freelance technicians sign forms indicating that they are independent contractors for whom taxes need not be withheld. *See* Def. Findings Nos. 40–42.

Freelance directors may accept multiple assignments, but they do not control either the time or the place of their work. They must appear at all scheduled activities of each employer, often without any limit as to day or hour. As a result, freelance directors may not, as a practical matter, work for two employers during a show's production period. *See* Brooks Tr. 1461–66, 1476–77; Cates Tr. 870–81; Pl. Ex. 6 at 1; Pl. Ex. 10 at 1. Further, directors are obliged to complete their work on or before the date requested by the producer. *Compare Bernstein v. Universal Pictures, Inc., supra,* 517

F.2d at 980 (composers' status as independent contractors indicated by their control of pace and location of work).

Freelance directors have no "right to control" the creative elements of shows they direct. *See Taylor v. Local 7, Journeymen Horseshoers, supra,* 353 F.2d at 596 (whether worker is independent contractor depends on the " 'nature and amount of control reserved by the person for whom the work is done' "). Guild agreements expressly reserve to employers the power to supervise and control freelance directors. Producers have complete discretion in determining what revisions, deletions, or abridgements to make on directors' work product. Moreover, employers reserve the power to approve all decisions delegated to directors, including all hiring and all creative issues. Most freelance directors have little or no role in formulating or administering the budget for productions. They have only limited input into the selection or development of the script. Typically, they do not select the performing talent; nor do they control the important function of editing programs. Brooks Tr. 1468–69, 1485; Singer Tr. 1557–58. Lafferty Tr. 1656. Finally, although the degree of producer or employer supervision and control varies in particular cases, these powers are frequently and pervasively exercised by producers. Cates Tr. 882–83; Brooks Tr. 1486; Singer Tr. 1565; Lafferty Tr. 1649; Wilson Tr. 1736. Where directors are left with substantial control and creative authority, it is because producers decide that such a policy is appropriate for the show involved or necessary to accommodate a particularly powerful director.[7] Even famous, award-winning directors, however, are often closely supervised by their producers.

Testimony at trial persuasively shows that the authority of freelance directors is limited and that the Guild's aims for director independence and creative control, as expressed in its constitution and recommended work descriptions in collective bargaining agreements, do not accurately represent current reality in the television film industry. Directors participate in many important production decisions, and their power over what is filmed necessarily carries with it some power to influence the final product, particularly in live productions. Nevertheless, producers, sometimes performing artists, and sometimes others have and often exercise the power to control director discretion. As HBO's witness Joseph Cates put it, "[i]n the real world, the authority exists with the producer." Cates Tr. 882–83. Thus, although freelance directors may independently contract for their work, once engaged they perform their tasks, albeit with skill and creativity, as employees. *See Julien v. Society of Stage Directors and Choreographers, Inc., supra* (stage directors are employees because producers select cast, control scene design, set budget and schedule of work, etc.).

Furthermore, the evidence does not support treating freelance directors any differently from staff directors. Freelance and staff directors overlap greatly in the functions they perform, in the creativity and skill they exercise, in the supervision they receive, and in the compensation they are paid. *See Taylor v. Local 7, Journeymen Horseshoers, supra,* 353 F.2d at 600 (comparison of freelance and staff farriers most telling evidence in deciding whether freelance farriers are independent contractors). The Guild demonstrated that freelance activities are common in the entertainment field. Not only do directors become freelance in large numbers, for example, but so too do associate directors, cameramen, stage managers, and other workers who are unquestionably employees. *See* Wolff Tr. 383; Franklin Tr. 1029–30; Def. Ex. 37; Connell Tr. 671. Though many staff directors have chosen to become freelance, their functions have not thereby been made markedly different from those of staff directors. This is

---

7. The language in the Guild agreements defining the functions of directors, which makes them "[s]ubject . . . to the supervision and control of the Producer," Pl.Ex. 38 at 6, *see* Def. Ex. 48 at 37 ("Employer's decision in all business and creative matters shall be final"), originated at the insistence of the television networks in 1952 negotiations. Kane Tr. 1525–26.

so because the trend to freelance status for directors has not been the result solely of a desire by directors for greater creative independence. Rather, it is the product of many forces, and particularly of the needs and interests of the television networks, which have for some years been under legal and economic pressures to surrender control over programming, pressures that have led to the establishment of numerous independent production companies. These smaller entities have less need and capacity to retain full-time staff directors. Furthermore, the need for directorial services was reduced in all production entities by the advent of tape and other filming techniques; live television programming, which created a great need for directorial services, has now been substantially abandoned in many areas. The networks and production companies have retained full-time staff directors chiefly to work on programs produced on a regular basis, and they have reduced the number of such directors in large part because they need fewer full-timers. Franklin Tr. 1060–62; Lafferty Tr. 1651–54; Kane Tr. 1510–11; Cates Tr. 894–96; Coyle Tr. 1189–90.

Given this background, it is not surprising that the degree of supervision and control over freelance and staff directors is largely the same. *See* Def. Findings Nos. 87–96. The types of programs that are produced with sufficient regularity to cause networks and others to retain full-time directors (*e.g.*, news shows, soap operas, sports programs) tend to demand routine repetition of established techniques, whereas the programs produced independently (*e.g.*, features, entertainment shows), on which freelance directors generally work, tend to demand a higher degree of creativity and spontaneity. Nevertheless, many regularly produced programs are directed by freelancers, and many freelancers work steadily for the same employer over long periods of time. Def. Exs. 677, 687–96, 700, 702; Wilson Tr. 1719; Brooks Tr. 1474–75; Gumpel Tr. 1325–28. Further, although regularly produced programs may tend to demand less creativity for most individual productions, the evidence shows that some

such programs demand creative talent of the highest order; others undoubtedly require occasional improvements and adjustments that call for imagination and great skill. Conversely, a special production need not be special at all; routinized techniques are quickly developed for virtually all types of programs, thereby minimizing the mishaps and errors inherent in the exercise of spontaneous judgments. Many programs directed by freelance personnel demand minimal experience and creativity; HBO has itself employed as freelance directors individuals with no prior directorial experience and has required, for some of its programs, directorial services that require little skill or imagination. Connell Tr. 621–27; Braine Dep. 117–19; Meister Dep. 149–50, 157.

That freelance directors seldom if ever have become staff directors does not indicate that staff positions are necessarily lower in status or always demand lesser skills. Rather, it in part reflects the fact that the industry's organization has long blocked the creation of sufficient incentives for such a development; it also reflects a now well-established pattern of employment in which directors tend to specialize by type of program. Staff directors at the top of their particular specialties, such as Harry Coyle, NBC's renowned sports director, are undoubtedly more skilled and creative than many, if not most, freelancers. Coyle Tr. 1181–1222.

The similarity in the functions and capacities of staff and freelance directors is also reflected in the closeness of the salaries they are guaranteed. Staff directors receive a regular salary, whereas freelance directors are in general paid fees for each program. Guild collective bargaining agreements have historically provided, however, that staff directors receive eighty percent of the fees payable to freelance directors for work on commercially sponsored programs. This twenty percent difference, which has been maintained to the present, appears to result from the greater security and fringe benefits historically available to staff directors. Taking into account that

explanation of the difference, the two groups receive roughly equivalent minimum compensation. Def. Ex. 18; Pl. Ex. 39–40; Franklin Tr. 1026–28. A successful policy of wage parity may of course reflect the ability of a union to use the leverage obtained from representing a relatively talented group (freelancers) to obtain higher wages for a relatively untalented group (staff directors). But on the record compiled in this case, the minimum salary equivalence of staff and freelance directors seems attributable to the similarity of functions they perform and the relative equivalence of at least the minimum value of their services.

For all of the foregoing reasons, freelance directors are employees, not independent contractors or entrepreneurs. Yet even without regard to that conclusion, the similarity of functions and overlap of capacities among staff and freelance directors creates a mutuality of interest that readily justifies their bargaining collectively. If minimum wages or other conditions of employment differed materially for these two groups, the terms of employment enjoyed by the more advantaged group could well be affected by the availability of directorial services in the other group at lower prices. Staff and freelance directors are to a considerable extent interchangeable; indeed, employer decisions more than anything else determine throughout the industry whether a set of directors is on staff or freelance. Thus, staff and freelance directors are in much stronger job competition than were the musicians and bandleaders in *American Federation of Musicians v. Carroll, supra,* which permitted a bargaining combination of the two groups.

### 2. *Loan-Out Companies*

■ Freelance directors have in many instances established personal service corporations to contract out their services. About 400 members of the Guild have formed such entities, commonly referred to as "loan-out companies." These companies have as their sole asset the services of the individual director and are wholly owned by that director. They have no other employees, no offices, and no equipment, and they engage in no business activities other than renting out the services of the director-owner. Directors who use loan-out companies to contract out their services execute side agreements with employers guaranteeing their services. *E.g.,* Def. Ex. 687–97; Pl. Ex. 12–14.

Loan-out companies are formed for the purpose of exploiting certain tax advantages available to the freelance director—principally, the establishment of tax-deferred retirement plans at substantially higher levels than would otherwise be possible. Nevertheless, when the director who owns a loan-out company works for a production company, his compensation is paid to the loan-out company as a fee. Furthermore, the Guild treats loan-out companies, for purposes of the director's compensation, as legally and factually the employers of the directors whose services they sell. These companies have all executed collective bargaining agreements with the Guild. On the other hand, the Guild also requires that the production companies to which loan-out companies lend their directors' services be signatories; the Guild treats them as employers of the directors and as responsible for compliance with the terms of the collective bargaining agreements. Pl. Ex. 38 at 41–42; Def. Ex. 48 at 112–113; Wolff Tr. 398–99, 409, 414–16, 419.

HBO correctly argues that the corporate status of loan-out companies may not be ignored. The Guild's treatment of these companies as employers for pay purposes, as well as any other consequence of their existence, must be weighed in considering whether loan-out companies, or their director-owners, constitute a labor group within the meaning of *Hutcheson.* Those facts alone, however, are by no means conclusive. *Cf. Perma Life Mufflers, Inc. v. International Parts Corp.,* 392 U.S. 134, 141–42, 88 S.Ct. 1981, 1985–1986, 20 L.Ed.2d 982 (1968); *Schenley Distillers Corp. v. United States,* 326 U.S. 432, 437, 66 S.Ct. 247, 249, 90 L.Ed. 181 (1946); *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925).

As plaintiff argues, directors who use loan-out companies might be characterized as operating independently, in that they are capable of perceiving and utilizing the corporate form for sophisticated business planning. But the evidence supports no more than the conclusion already reached that freelance directors operate with great independence in selling their services. What is critical for the *Hutcheson* test is that loan-out companies add nothing to the limited latitude afforded freelance directors in their actual work, and their use has no effect in principle or practice on the right to control productions, normally retained by producers. Such companies are merely financial arrangements; they do not alter the character of the employment relation between directors and the production companies for which they work. In sum, nothing in the nature or operation of loan-out companies affects the conclusion that the freelance directors who own such companies are not independent contractors or entrepreneurs. These directors therefore constitute a labor group under *Hutcheson*. Cf. *Fugazy Continental Corp.*, 231 N.L.R.B. 1344 (1977), enf'd, 603 F.2d 214 (2d Cir. 1979) (employee's becoming franchise owner and operator for compensation purposes does not alter status as employee of entity for which he performs the work).

Loan-out companies themselves likewise constitute a labor group. That the Guild requires them to become signatories to collective bargaining agreements is of limited significance. The Guild's purpose in having loan-out companies become signatories is the lawful and reasonable one of preventing directors who own them from evading any responsibility of Guild membership. Moreover, although the loan-out companies involved are employers, they are employers for the extremely limited purpose of filtering the director's compensation for tax planning. For all purposes relevant to the statutory exemption, loan-out companies are identical to their director-owners. Like the directors that own them, they are engaged solely in the business of selling one person's labor. Furthermore, under the Guild's collective bargaining agreements

with the production companies that hire the director-owners of loan-out companies, the production companies' obligations are treated by the Guild as running to the loan-out companies for compensation purposes but to the director-owners for other purposes. Consequently, loan-out companies are squarely within the protection of the collection of statutes that take labor, when acting alone, out of the ambit of antitrust proscriptions and that serve as the underpinning of the *Hutcheson* doctrine.

Finally, even if loan-out companies are not treated as identical to their owners, they constitute a labor group because of the relation in which they stand to their director-owners. As with the agents in *H. A. Artists & Assoc., Inc. v. Actors' Equity Ass'n, supra,* and the bandleaders in *American Federation of Musicians v. Carroll, supra,* loan-out companies stand in a position from which they are able substantially to affect the directors' collective interest in maintaining the Guild wage scale and other standards. As Judge Lumbard expressed it in *H. A. Artists,* such companies "stand athwart the current of wages paid by employers to union members." *H. A. Artists & Assoc., Inc. v. Actors' Equity Ass'n,* 622 F.2d 647, 650 (2d Cir. 1980), modified, 451 U.S. 704, 101 S.Ct. 2102, 68 L.Ed.2d 558 (1981). They are therefore in at least as strong an "economic interrelationship" with union members as those independent contractors involved in the Supreme Court cases finding analogous categories of non-employees within the statutory exemption.

### 3. Producer-Directors

■ Some director members of the Guild are from time to time designated "producers" as well as directors. This dual designation has been given to both staff and freelance directors. "Producer," however, carries no definite meaning in the trade. The term is used to include executive producers, live producers, creative producers, associate producers, and "shadow" producers. A producer may have great authority over a production or may be a figurehead, possibly the spouse of a star performer, doing little or

nothing to justify the title. Individual directors are sometimes called "producer-directors" even though they perform only functions associated with the role of director. On the other hand, there exists in the television and film industry the function of supervising and managing productions. Many persons designated producers are in fact the business and artistic managers of the productions on which they work. At times, director members of the Guild are assigned those production-management functions, sometimes. in conjunction with, and sometimes separately from, their performance of the directorial functions. *See* Furst Tr. 36, 49, 52, 59, 105; Lafferty Tr. 1624, 1634–35, 1671–76; Fuchs Tr. 139–45, 237–38, 242, 331; Evans Tr. 562–63, 566, 577, 597; Connell Tr. 628, 630–31, 653; Franklin Tr. 1147–49, 1151–53; Pl. Ex. 1A.

The uncertainties inherent in the designation "producer" preclude a finding that all directors who are also called producers are independent contractors in the work they perform. Some producer-directors are full-time staff members, hired and functioning as employees; HBO has not claimed that those individuals are anything but employees permitted to bargain with other staff members of the Guild. Furthermore, all producer-directors, both freelance and staff, are able to and do work at times as directors only. When they do so, their status is similar to that of staff directors and essentially identical to that of freelance directors. Finally, many directors given the title of producer perform functions so substantially similar to those of directors, or are subject to such control (by production company executives, for example) in the manner in which they carry out their producing tasks, that they must be considered employees in the same sense as freelance directors.

■ With respect to the narrow class of producer-directors defined by HBO in its Post-Trial Reply Memorandum, however, a different conclusion is warranted:

> The free-lance producer-director . . . [is] one who is engaged for a particular television program or series of programs, and who, subject only to the contractual right of approval, if any, of the purchaser or owner of the program, does have supervision and control over the manner and means by which a television program is created, including at least:
>
> 1. All changes and cuts in the script at the time of recording or "on-the-air" to bring the script into conformity with his artistic interpretation and time requirements;
>
> 2. Casting and auditioning for casting;
>
> 3. Determining, in production conferences with any persons assigned to the program, all audio and video elements of the program;
>
> 4. Selection and approval of music;
>
> 5. Selection and supervision of the technical crew, associate director, stage manager, set designer, costume designer, lighting designer and musical director;
>
> 6. Directing all elements of the program;
>
> 7. On-the-air integration of the various elements that make up a multimobile unit or multipoint origination;
>
> 8. Surveying all remote locations; and
>
> 9. Editing the program if it is prerecorded (including sweetening, if any).

Pl. Post-Trial Reply Memorandum 21–22 (footnote omitted). When a director is actually assigned the specified tasks of managing the fiscal and artistic aspects of a production, as HBO defines them, the director has much greater control than directors normally have. Such a producer-director is subject to the ultimate control of the production company employer. By definition, however, such a producer-director would exercise actual control over the allocation of the budget, all hiring, work schedules, filming, editing, and other elements of the production. The degree of control exercised by such an individual would be markedly greater than that ordinarily exercised by directors not also acting as producers. Even when a producer-director that fits HBO's definition gets paid by time and not

by output, he or she is properly regarded as an independent contractor under common law standards.

Despite the independent-contractor status of such producer-directors, however, they may properly be the subject of the Guild's collective organizing efforts. Even the narrow class of producer-directors HBO defines —and, *a fortiori*, less independent producer-directors—are in job or wage competition or some other economic interrelationship affecting legitimate union interests with the union members. *American Federation of Musicians v. Carroll, supra*, 391 U.S. at 106, 88 S.Ct. at 1567. All producer-directors, by definition, perform all the functions generally performed by directors, particularly freelance directors. They are therefore in direct competition with other Guild members for Guild-category jobs. Any directing job performed by a producer-director is one that a Guild director who is not also a producer might otherwise perform. The Guild has a legitimate interest in seeking to preserve the directorial parts of the producer-director's job for its members working under Guild-established terms and conditions. It has a legitimate interest as well in preventing the erosion of standards threatened by the existence of productions on which directors work under substandard conditions. Like the milk vendors in *Milk Wagon Drivers Local 753 v. Lake Valley Farm Products, Inc., supra*, the owner-drivers in *Oliver I, supra*, and the bandleaders in *American Federation of Musicians v. Carroll, supra*, producer-directors have a dual function, one of which puts them in job competition with union members who perform only that function and who seek to maintain the wages and working conditions they have collectively established. Moreover, unlike the owner-drivers or bandleaders, producer-directors are not employers; they assume none of the entrepreneurial risks associated with ownership, and although they may possess considerable budgetary authority, they do not ultimately control the budget or pay the price for budgetary deficits.

Even if HBO's narrow definition of "producer-director" theoretically described a category of independent contractors with whom the Guild should not be permitted to combine, that designation is so vague that production companies might use it to escape the terms of employment sought by the Guild for its directors. Many freelance directors perform functions like those of producers. Employers could often plausibly claim, therefore, that directors are not employees. Without a workable method of identifying those producer-directors whose work regularly and substantively differs from that of ordinary directors, employers would be able to manipulate designations and functions and thereby to create grave problems for the Guild in preserving its membership's legitimate interests. HBO has failed to offer a definition of producer-directors that, in the real world of television-program production, could be manageably applied to identify independent contractors without potentially disrupting legitimate Guild activity.

Finally, the Guild disclaims any desire to control the activities of producers when they are not also acting as directors. "Thus, while a Guild member would be prohibited by the Guild constitution from working as a director for a non-signatory employer, such as HBO, there would be no corresponding prohibition respecting performance of any non-directorial functions including producer functions." Def. Post-Trial Memorandum 84. Nothing in the record controverts the Guild's assertion that it fairly adheres to this policy. Consequently, on this record, the Guild must be assumed to have gone no further in regulating and in exploiting the bargaining power of producers than appears reasonably necessary to protect the legitimate interests of its director members. On this assumption, the Guild may lawfully include among the labor group that it represents directors who also perform the functions of producers.

### 4. *Director-Packagers*

■ Among the Guild's freelance director members are a small number of individuals who produce and market television programs either as individuals or through enti-

ties such as corporations, partnerships, joint ventures, or associations. HBO has characterized all such individuals as "packagers," in that they undertake to produce and market a finished television-program package. Most packagers are writers or performers, but at least a few are directors, of whom some are members of the Guild. Director-packagers are owners as well as employees of their production companies. More precisely, for purposes of this lawsuit, a director-packager is, as HBO defines the role,

one who, in addition to having all the characteristics of a producer-director . . . :

1. Owns and operates an entity or is himself engaged in the business of selling, licensing or otherwise providing a finished television program to a customer for a negotiated price;

2. Makes the decision to produce the program; and

3. Controls the budget for the program.

Pl. Post-Trial Reply Memorandum 25. Director-packagers sometimes work both as director and packager, but also sometimes only as a director for production companies other than their own, and sometimes as a packager but not a director.[8]

For purposes of labor-antitrust law, packagers, as HBO defines them, are identical to the production companies they own. No labor negotiations take place between packagers and their companies, and HBO treats director-packagers as identical to their companies for purposes of characterizing the unlawful combination between them and the Guild. Pl. Post-Trial Memorandum 15–16.

A television packager is an employer and a businessman. Unlike a loan-out company, which contracts only for the service of its director-owner, a production company is a multi-faceted operation engaged in making television films for sale in the market. A production company generally has several full-time and many freelance employees, and leases or owns offices and production facilities as well as office and production equipment normally associated with a business. Pasetta Dep. 11–14; Hemion Dep. 17–19. Frequently, the packager conceives of a program and then attempts to sell it; at other times, customers for television films approach the packager with ideas for programs, which the packager may agree to make. Once an idea is accepted, the packager and his customer normally agree on a price, which includes the estimated cost of the production and the packager's profit. The packager then generally arranges for a script, selects a production group, produces the program, and sometimes helps to advertise and sell it. Pasetta Dep. 61, 70; Hemion Dep. 20–21. Purchasers of shows generally retain some form of approval to ensure that they obtain approximately what they agreed to buy. But their approval does not materially interfere with the packager's business and creative control; they merely require the packager to stay within the parameters of the pre-production agreement.

Packagers are often entrepreneurs. They earn no salary, but profit or lose on the programs they make depending on their success in producing acceptable programs for less than the agreed fee. A flat fee is usually established for a program before production begins. If the show is produced for less than the fee, the packager retains the difference; if not, the packager loses the difference. The packager does not merely make up or keep within a production budget, as some producers are called upon to do. Packagers are often ultimately responsible for the budget, reaping the benefits of successful management and bearing the burden of failure. They negotiate with employees, unions, suppliers, and purchasers. Martin Pasetta explained that, as a director-packager, he was "responsible for

---

**8.** HBO has not shown how many of those commonly called director-packagers actually meet its definition. Indeed, with respect to the most important characteristic—assuming the risk of loss on the packaged program, the evidence indicates that few such director-packagers qualify under HBO's definition. *See* Cates Tr. 860; Furst Tr. 62–67; Fuchs Tr. 209–19; Evans Tr. 617–21. For purposes of analysis, this Court adopts HBO's abstract definition, treating its relation to the real world of the television industry as speculative.

legal contracts with everyone, including talent unions." He does the payroll and insurance and bears the usual corporate liabilities: "I have the responsibility of delivering a package either in a profit or loss situation, and I either make a profit or I have to eat it, as they say." Pasetta Dep. 70.

When a director member of the Guild works as a director-packager, he is nonetheless a packager. As such, the director-packager is an entrepreneur and cannot claim *Hutcheson's* protection as an employee who may combine with other employees or with labor organizations. The Guild contends, however, that its combination with director-packagers in collective bargaining activities is lawful under the principles articulated in *Carroll*, even if director-packagers are entrepreneurs.

The Guild disclaims any intention to prevent director members, through its membership rules, from "working in a non-Guild capacity for a non-signatory employer, including HBO, or . . . [to prevent] a Guild member from being a principal of a non-signatory company." Def. Finding No. 127. Nothing in the record casts doubt on this disclaimer. The Guild seeks protection under *Carroll* only for its efforts to prevent any of its members, including director-packagers, from working in a "Guild covered capacity" for any nonsignatory employer, including HBO. For the limited purpose of Guild representation of director-packagers "with respect to their activities as directors," Def. Post-Trial Memorandum 93, the Guild argues, director-packagers are a labor group within the meaning of *Carroll*, and hence within the *Hutcheson* standard.

Director-packager Guild members are, as the Guild asserts, in "job or wage competition or some other economic interrelationship affecting legitimate union interests between the union members and the independent contractors." *American Federation of Musicians v. Carroll, supra*, 391 U.S. at 106, 88 S.Ct. at 1567. Each time a director-packager directs a program for a nonsignatory, he replaces a "union job" with a "non-union job." *Id.* at 108, 88 S.Ct. at 1568. A director-packager under no obliga-

tion to meet Guild terms for director employment can relax those terms and thereby offer programs for sale or license at lower rates than he otherwise could. That practice, like those at issue in *Carroll* and *Oliver I*, threatens the union wage scale and other standardized conditions: "the result is price competition through differences of standards in the labor market," *id.* at 111 n.12, 88 S.Ct. at 1570 n.12, precisely the sort of competition that the several labor-antitrust exemptions authorize labor to attempt to eliminate. As the Supreme Court said in both *Oliver I* and *Carroll*, the Guild's efforts to forbid director-packagers from directing programs for nonsignatories is " 'a direct and frontal attack upon a problem thought to threaten the maintenance of the basic wage structure.' " *Id.* at 110, 88 S.Ct. at 1569 (quoting *Oliver I, supra*, 358 U.S. at 294, 79 S.Ct. at 303).

That director-packagers are not only independent contractors but entrepreneurs has no effect on this conclusion. In *H. A. Artists, Carroll, Oliver I*, and *Milk Wagon*, entrepreneurs were held within the statutory exemption for certain collective-representation purposes. That director-packagers are employers of Guild members likewise does not undermine this conclusion. *Carroll*, too, involved entrepreneurs who were employers of union members.

Director-packagers who are Guild members constitute a labor group for purposes of the Guild's representation of them in their directorial capacity because "when working *as directors*, they compete with other members of the Guild for job opportunities and wages and necessarily perform 'duties and functions' which actually or potentially [affect] the hours, wages, job security and working conditions of other members of the Guild." Def. Post-Trial Memorandum 94. This is apparent in particular from the fact that director-packagers sometimes work as directors for production companies other than their own. When they do so, they are legitimately members of the Guild, and the Guild may lawfully insist, through enforcement of its constitution and by-laws, on their working

only for signatories. The Guild has a legitimate interest in preventing them from performing Guild-category work for any employer not signatory to a collective bargaining agreement; all unions have such power over their members. *See Scofield v. NLRB,* 394 U.S. 423, 89 S.Ct. 1154, 22 L.Ed.2d 385 (1969); *NLRB v. Allis-Chalmers Mfg. Co.,* 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967); R. Gorman, *supra,* at 677–89. This case, therefore, does not involve a situation in which the regulated entrepreneurs are not union members or in which, like the grease peddlers in *Los Angeles Meat & Provision Drivers Union v. United States, supra,* they may not legitimately be union members because there is no competition or any other economic interrelationship with other union members. *Compare* 371 U.S. at 97–98, 83 S.Ct. at 164–165.

Relatively few director-packagers exist. But that does not alter the conclusion that they stand in a *Carroll* relation to Guild members. A union has power to prohibit even a single one of its members from working in a union capacity for a nonsignatory. Nothing in the Supreme Court's analysis in *H. A. Artists, Carroll, Oliver I & II,* or *Milk Wagon* suggests that a union must wait to regulate the terms of employment of those in job and wage competition with union members until the subjects of the regulation have already made substantial inroads. All that is necessary is that there be evidence that there is actual or potential job or wage competition, *see American Federation of Musicians v. Carroll, supra,* 391 U.S. at 114, 88 S.Ct. at 1571, that the union's objective be to protect its legitimate interests, *Oliver I, supra,* 358 U.S. at 293–94, 79 S.Ct. at 303–304, and that the regulations be an attack on "a problem thought to threaten" the union's established standards, *id.* at 294, 79 S.Ct. at 303–304, *quoted in American Federation of Musicians v. Carroll, supra,* 391 U.S. at 110, 88 S.Ct. at 1569. To hold otherwise would be to prevent the union from attacking at its inception "competition through differences of standards in the labor market." 391 U.S. at 111 n.12, 88 S.Ct. at 1570 n.12. In any event, even a few directors free to work without Guild constraints could, in this area of commerce, substantially affect the interests of other Guild members, and the number of director-packagers might well increase if the Guild's combination with them were found unlawful. HBO's definition of "director-packager" would enable HBO, for example, to provide directors with the financing to become director-packagers. Indeed, HBO has provided the necessary financial backing to at least two of the mere handful of current director-packagers, and HBO could easily provide them with talent, script, and other components of a production. *See* Furst Tr. 62–67; Fuchs Tr. 209–19; Evans Tr. 617–21. The director-packager position might thereby become a tool for evading Guild standards.

For the foregoing reasons, director-packager Guild members are a "labor group" insofar as they work as directors. The Guild may therefore forbid them to work as directors for nonsignatories and require them to comply, to the extent they work as directors on their own productions, with all lawful terms of the Guild's agreements.

## B. *The Nonstatutory Exemption*

HBO argues that the Guild's agreements with production companies restrain competition because they make programs available to commercial television on better terms than to HBO and because they reduce competition among signatory production companies in the sale or license of programs. *See* Pl. Post-Trial Memorandum 14–15, 80; Pl. Findings Nos. 60–61. With respect to its claim of reduced competition in the market for programs, HBO contends simply that "[t]he restraints included in the [challenged agreements] would be imposed on the television program market and therefore, under principles established in *Connell, Pennington* and *Allen Bradley,* are not protected by the labor exemption." Pl. Post-Trial Memorandum 14. With no further elaboration, HBO concludes that, because of their "direct and substantial impact on the product market," *id.,* the Guild's agreements are outside the nonstatutory exemption and unlawful under section 1 of the Sherman Act.

The nonstatutory exemption, as interpreted by the Second Circuit, protects the terms of collective bargaining agreements if those terms were agreed to at arm's length, apply only within the bargaining unit, and so concern legitimate union interests that they are sanctioned by labor law. The agreements challenged by HBO are collective bargaining agreements reached at arm's length; that is, "the circumstances of [their] negotiation are such that it can be said that the union acted unilaterally." Handler & Zifchak, *supra,* 81 Colum.L.Rev. at 485. The economic cost of the agreements to production companies, as well as the Guild's need to resort to coercion against some director-packagers, indicated that the Guild "pursued the agreement[s] in its own self-interest, rather than 'at the behest of or in combination with [production companies].'" *Id.* (quoting *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., supra,* 381 U.S. at 690, 85 S.Ct. at 1602).

HBO's argument that the Guild's agreements favor free television over pay television led the Court to inquire at trial whether HBO claimed that a conspiracy of any kind exists between production companies, free television, and the Guild, aimed for their mutual advantage at placing pay television at a disadvantage relative to free television. HBO expressly disclaimed any such contention. HBO's counsel responded: "I don't know how the networks got into this . . . . In any event, we are not claiming that the networks are doing anything other than doing their business so far as this case concerned." Tr. 1769. In any event, recent negotiations have resulted in free-television companies' accepting the percentage-of-gross provision sought by the Guild in the pay-television field. Nothing in the record even suggests, therefore, that the Guild has acted jointly with any employer to place HBO at a disadvantage. Although the collective bargaining agreements represent joint action, they are indisputably reached at arm's length.

Even arm's-length negotiation may lead to agreements that violate the antitrust laws, because of the impact of their terms on the product market. Here, most of the provisions in HBO's collective bargaining stance apply only within each bargaining unit. Some of the terms the Guild seeks will inevitably affect the product market, however. The Assumption Agreement requirement, in particular, requires the signatory employers to seek a commitment from licensees or purchasers of films to comply with some of the terms negotiated between the Guild and its signatories. The legitimacy of these terms, therefore, depends on their relative impact on the product market and the interests of union members. *See Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., supra,* 381 U.S. at 689–90, 85 S.Ct. at 1601–1602; *Berman Enterprises Inc. v. Local 133, United Marine Division, ILA, supra,* 644 F.2d at 935 n.8.

Labor law policies strongly support virtually all the terms sought by the Guild and lend considerable theoretical support even to the Guild's effort to obtain Assumption Agreements. Although the Guild's objectives may not all be "affirmatively sanctioned" by labor law, as in *Jou-Jou Designs, Inc. v. International Ladies Garment Workers Union, supra,* 643 F.2d at 910, all relate to "legitimate union objectives," *Berman Enterprises Inc. v. Local 333, United Marine Division, ILA, supra,* 644 F.2d at 936. Consequently, HBO carries a substantial burden of persuasion in attacking these provisions, even where they appear intended to affect the product market. HBO has failed to meet that burden. All the challenged terms of the agreements with production companies, whether or not the companies are owned by director-packagers, are protected by the nonstatutory exemption.

### 1. *Notice and Bargaining*

■ The first provision that HBO challenges is one requiring signatory production companies to give notice and to bargain before leasing or selling programs to pay television. Section D of article XXIV of the Freelance Agreement and section 18–104 of the Basic Agreement forbid a signatory to hire a Guild member for a pay-television program without, first, notifying the

Guild "no later than sixty days prior to the date upon which it intends to engage any such employee" and, second, reaching agreement with the Guild on the terms of employment. Pl. Ex. 38 at 98. If agreement is not reached, the Guild may upon sixty days notice to the employer instruct its members to refuse to render services for such programs.[9] These provisions effectively create contractual obligations on the part of both parties to bargain about the terms of employment of directors for pay-television programs.

A notice requirement has an impact on the product market, in that it prevents the sale or licensing of film to pay television until after notice and bargaining have taken place. In this instance, the employer must give sixty days notice before engaging a Guild director, and the Guild undertakes to give sixty days notice before instructing its members not to render directorial services. The requirement applies to the retention of Guild directors by any packager, including a director-packager's retention of himself.

In some industries, a sixty day notice requirement prior to bargaining might effectively prevent or seriously interfere with sales. In the television industry, however, the notice period is reasonable and neither intended nor likely to interfere with sales. HBO's television programing is done generally a full season in advance. Furst Tr. 115. Furthermore, an employer keen on reaching agreement with the Guild in advance is free to attempt to do so, and nothing in the record suggests that the Guild would not make every effort to expedite negotiations in particular cases. Finally, the Guild's obligation to give sixty days notice before

instructing its members not to render services is merely a device for allowing a reasonable time for the parties to reach agreement before the instructions take effect. In short, any effect on the product market by the notice-and-bargaining provisions is minimal and probably avoidable where necessary.

On the other hand, the notice and bargaining requirement is fundamental to the interests of the union. It formally preserves the Guild's interest in collective bargaining on mandatory subjects. A duty to bargain about particular categories of work would exist even without those provisions, for the duty to bargain continues during the term of a collective bargaining agreement and applies, absent contractual waiver, to the terms of employment for work not covered by the original agreement. *See J. I. Case Co. v. NLRB*, 253 F.2d 149, 153 (7th Cir. 1958); *Local 323, International Brotherhood of Electrical Workers*, 242 N.L.R.B. 305 (1979); R. Gorman, *supra*, at 455–80. Even if the employment terms for pay television were not a mandatory subject of bargaining absent the notice and bargaining provisions, they are doubtless a subject on which the parties may contractually oblige themselves to bargain in the future. A violation of such a commitment would be actionable under federal labor law as a contractual breach. 29 U.S.C. § 185 (1976). An employer's unilateral action contrary to the provisions would also violate the duty to bargain under section 8(a)(5) and 8(d) of the NLRA. *See* R. Gorman, *supra*, at 463–66. For these reasons, labor law should be read as sanctioning such provisions, given the fundamental goal of federal labor law to

---

**9.** The Freelance Agreement version states:

In the event that the employer shall desire to engage any Director[,] Associate Director or Stage Manager for programs intended primarily for release on pay-type CATV, Pay Television or for cassettes, to be released in Supplemental Markets, the Employer will give the Guild notice of such desire no later than sixty days prior to the date upon which it intends to engage any such employee.

Guild and Employer shall thereafter meet and bargain in good faith for the purpose of

agreeing upon the terms and conditions of employment and compensation for such employees engaged by the Employer, and if no agreement is reached between Employer and Guild with respect thereto, Guild may upon sixty (60) days written notice to Employer, instruct its members to refuse to render services with respect to the production of any such programs.

Pl. Ex. 38 at 98. The Basic Agreement version differs only in that it applies to film. Def. Ex. 48 at 132–33.

encourage the resolution of employer-employee disputes by collective bargaining.[10]

### 2. *Percentage of Gross*

 The Special Amendment to the Guild's Freelance and Basic Agreements requires that a signatory pay directors the greater of "the applicable minimum network prime time rate" and four percent of "the gross revenue derived by the [signatory] from licensing the exhibition of the program on pay television." In addition, the Guild seeks a representation from each signatory "that its gross revenue for licensing the exhibition of the program on pay television will be not less than $_____." Pl. Ex. 70, ¶ 6(a)(ii).[11] The Guild has thus sought to partake in what it views as the high revenues being earned by pay television. In its negotiations with HBO the Guild proposed this provision, and HBO's objection to it became the point over which negotiations broke down. Other production companies have accepted the provision in collective bargaining agreements with the Guild. *E.g.*, Pl. Exs. 72, 81, 86; Def. Exs. 156, 158. HBO has refused to license programs from such production companies because, as Michael Fuchs testified, HBO has been concerned that the agreement of signatory production companies to a percentage-of-gross provision sets a bad precedent and that HBO's acquiescence would be seen as an endorsement of that provision. *See* Fuchs Tr. 295, 314–15.

The percentage of gross that the Guild seeks for its directors is that of the license fee paid to the signatory, not of the total earned by a licensee such as HBO. HBO therefore cannot contend that the Guild's agreements with production companies exact a percentage of HBO's revenues. HBO's more cogent complaint is that the Guild is seeking agreements with packagers that will make the production of programs for pay television more expensive than for free television. Thus, whereas packagers would be able under the Special Amendment to charge networks the prime-time rate for director services, they would be required to charge pay television companies the greater of the prime-time rate and the percentage-of-gross provision. Furthermore, in its representation of minimum gross revenue the packager might in effect be agreeing in advance to a minimum price for pay-television programs, whereas no such requirement exists with respect to programs leased to the networks. The effect of these provisions, argues HBO, is to reduce competition in the market for television programs and to place pay television companies at a competitive disadvantage with free television in the product market for such programs.

The possibility that HBO and other pay-television companies might be placed at a disadvantage relative to free television poses a potential violation of the antitrust laws. Had the Guild conspired with film producers or the networks to devise this price discrimination, the Guild's conduct would fall outside both the statutory and the nonstatutory exemptions. *See Allen Bradley Co. v. Local 3, Electrical Workers,*

---

**10.** HBO's papers may also be read as challenging the union security clauses in the Guild agreements. Pl. Ex. 38 at 13 (Freelance Agreement art. IV, § A); Def. Ex. 48 at 6 (Basic Agreement § 1–301). Such clauses are explicitly approved by section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) (1976), and are therefore exempt from antitrust challenge. *See Jou-Jou Designs, Inc. v. International Ladies Garment Workers Union, supra*, 643 F.2d at 910.

**11.** The standard form of the Special Amendment, which refers to the signatory as "Company," states in relevant part:

6. (a) Company agrees to pay to the Director of the program or segment thereof for initial release or exhibition on a pay television system (such as Home Box Office or Showtime) as herein set forth, not less than the following compensation:

(i) The applicable minimum network prime time rate specified in Article VI, plus

(ii) an additional sum equal to the difference between the amount specified in (i) above and four percent (4%) of the gross revenue derived by the Company from licensing the exhibition of the program on pay television. Company represents that its gross revenue for licensing the exhibition of the program on pay television will be not less than $_____.

Pl. Ex. 76.

*supra.* But HBO has expressly disclaimed any conspiracy by the networks to obtain an advantage in their competition with pay television. Furthermore, although HBO alleges a combination between the Guild and television-program packagers, it does not claim, and has introduced no evidence to prove, that the percentage-of-gross provision has been or will be arrived at through complicity rather than through arm's-length bargaining. The Guild's motivation in seeking a percentage of gross for its director members has been solely to exploit what the Guild perceives as pay television's higher profit margins relative to free television. The Guild's rationale is overtly discriminatory, but it is based on the unrebutted claim that HBO makes more money than free television on the programs that Guild members direct; those programs therefore are proper objects for collective action aimed at extracting more money for the services of those members.

The Guild has informed the Court, moreover, that it has succeeded in obtaining a percentage-of-gross payment for its director members' work for pay-television programs in a series of new agreements with "all major companies in the television industry." Memorandum of Points and Authorities in Support of Motion of Defendant Directors Guild of America to Reopen Trial Record, app. 1. This action makes clear that the Guild's motivation has been to advance the interests of its members, not to ally with any set of employers against pay television. It also appears to put to rest the notion that the Guild's policy has been to discriminate against HBO in particular or against pay television in general. Nevertheless, even assuming a different compensation demand for HBO and pay television, such a union demand is lawful and protected if asserted for the union's benefit and not at the behest of an employer seeking to destroy pay television. *Compare United Mine Workers v. Pennington, supra.*

The payment of a percentage-of-gross license fees is a form of compensation. A union may lawfully seek higher compensation from employers it believes to be more able to pay, *see Cutler v. NLRB*, 395 F.2d 287, 290 (2d Cir. 1968), and may lawfully seek different wages for work performed in different fields, *see Local 323, International Brotherhood of Electrical Workers, supra.* In addition, "[p]rofit sharing, it is well established, is a form of employee compensation and, as such, is a mandatory subject of bargaining." *Impressions, Inc. & Twin Cities Printing Trades Union, Local No. 29*, 221 N.L.R.B. 389, 407 (1975). *Accord, NLRB v. Black-Clawson Co.*, 210 F.2d 523 (6th Cir. 1954). If profit sharing, which gives employees a portion of net receipts, is a form of compensation, so too is a percentage-of-gross-receipts arrangement, which cuts less directly into entrepreneurial rewards. The Guild percentage-of-gross provision, moreover, is no different in kind from other percentage-of-gross arrangements in the entertainment industry going back to the earliest days of television.[12] The challenged provision is thus an accepted form of compensation in this distinctive industry, a mandatory subject of bargaining sanctioned by labor law, and therefore within the nonstatutory labor-antitrust exemption.

Arguably, even though the Guild should be permitted to bargain with packagers for a percentage-of-gross guaranty, it should not be permitted to do so with director-packagers. Packagers who are also directors would appear more willing to agree to increased compensation for directors than packagers who are not directors. Furthermore, union pressures on director-packagers would probably be greater than on nondirector-packagers, because directors who refused to become signatories might be the subject of retaliatory action by the Guild, such as denials of opportunities to

---

12. For example, from 1948 to 1960, the Screen Actors Guild, the Writers Guild of America, and the Directors Guild all secured a percentage of gross license fees from the licensing of theatrical motion pictures for exhibition on tel-

evision. Franklin Tr. 980–84. Similar arrangements for supplemental use of television programs became common beginning in the early 1960s. Franklin Tr. 985–89.

work on productions other than their own. More broadly, HBO in effect argues that it has an interest, protected by the antitrust laws, in having sellers of the products it seeks unaffiliated with unions, so that the sellers will compete with one another as sellers rather than combine with the union to raise prices.

HBO's argument does not successfully distinguish director-packagers from other packagers for purposes of the nonstatutory exemption. Even if HBO is correct in arguing that it is legally entitled to access to programs produced by packagers other than director-packagers, the asserted right is not being violated. HBO has access to many sellers other than director-packagers, of whom there are only a handful. Moreover, HBO has not shown that director-packagers have been any less resistant to the Guild's demands than other packagers. Indeed, HBO has advanced no evidence that the Guild has significantly greater actual power over director-packagers than it has, as a powerful union, over other packagers. Further, if HBO claims that labor law forbids the Guild to punish director-packagers for refusing as packagers to sign Guild agreements, HBO should look to labor law to prevent the Guild from exerting unlawful pressure. If, on the other hand, labor law permits the Guild to impose punishments for such actions, then the percentage-of-gross provision is sanctioned by labor law. In either case, the impact on the product market is no different with a director-packager's signature on the agreement than with a nondirector-packager's and the Guild's interest is strong.

### 3. *Exhibition Restrictions*

 Paragraph 6(b) of the Special Amendment advanced by the Guild to establish the terms of employment for directors on pay-television programs restricts signatories' authority to license the exhibition of programs to a specified period. It provides that the payment agreed to in the percentage-of-gross provision will be for the right to exhibit the program for "not more than 15 exhibition days on any one pay television system ... within a single six-month period," and it absolutely prohibits the licensing of a program for any exhibition period of more than one year.[13] The exhibition restriction affects the product market by limiting the use of each program produced to a specified period. A pay-television company, under this provision, could not repeat the film more than the agreed number of times or over a period longer than one year. Thus, the provision would regulate the terms under which programs were leased to pay television and in the process would apparently place pay-television companies under greater restriction in their capacity to purchase the right to exhibit film than free-television companies.

The discriminatory aspect of the exhibition restriction has been reduced by recent agreements between the Guild and the networks.[14] Even assuming, however, that the Guild intends to seek greater restrictions over the licensing of programs to pay television than to free television, that objective is one that the Guild seeks in the interests of its own members. Nothing in the record suggests a conspiracy between the Guild and any packager or network to limit pay television's exhibition rights and thereby to place pay television at a competitive disadvantage. Furthermore, the Guild's motive in seeking to limit pay television's use of

---

**13.** Paragraph 6(b) of the Special Amendment states:

The payment provided for in 6. (a) above shall permit the company to license the exhibition of the program for not more than 15 exhibition days on any one pay television system in the United States in any market within a single six-month period. Said six-month period shall commence with the first exhibition day which shall mean any calendar day in which the program is exhibited one or more times in the market in question.

Under no circumstances may Company license the program for any exhibition day beyond the expiration of a period of one year following the first exhibition day of the program in any market in the United States. Pl. Ex. 76.

**14.** *See* Memorandum of Points and Authorities in Support of Motion of Defendant Directors Guild of America to Reopen Trial Record 3, app. 1.

programs directed by Guild members is based on the fact that pay television's reliance on repeat showings of programs is greater than that of free television. The Guild believes that pay-television companies will be able to satisfy their programming needs with fewer programs than free-television companies, because reruns are a very substantial part of pay-television schedules. Furst Tr. 8 (typical program repeated four or five times in six weeks). Finally, the provision—like all other proposed terms in the Special Amendment—is a demand that the Guild intends to make in negotiations with individual companies and with the networks. It is not, by way of contrast, a term in a labor treaty, subscribed to by all employers in an industry-wide bargaining unit. In fact, the Guild has not uniformly insisted on including this restriction in its agreements with pay-television production companies. *See* Pl. Exs. 72, 86; Pl. Post-Trial Memorandum 10. Indeed, no evidence controverts the Guild's assertion that since 1978 it has offered to omit the exhibition restriction in all negotiations with prospective signatories. Def. Post-Trial Memorandum 127.

If the Guild were to seek and to obtain the provision in future agreements, however, its inclusion would be lawful. The testimony of Michael Franklin and Michael Fuchs establish that the provision has both the purpose and the effect of preserving work for Guild directors. Franklin Tr. 980; Fuchs Tr. 287, 379. "[T]emporal limitations on reruns contribute to maintaining the demand for new programs and thereby preserve, indeed increase, work opportunities for Guild members." Def. Post-Trial Memorandum 125. Like residual payments for supplemental market exhibition, those limitations reflect the Guild's deep concern with the "technological unemployment" made possible by taping and rebroadcast. Franklin Tr. 1062–63. Work preservation is a legitimate union objective. *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., supra,* 381 U.S. at 691–92, 85 S.Ct. at 1602–1603; *Berman Enterprises Inc. v. Local 133, United Marine Division, ILA, supra,* 644 F.2d at 935; *Intercontinental*

*Container Transport Corp. v. New York Shipping Ass'n, supra,* 426 F.2d at 887. Whether or not the particular provision in the Guild agreements would be a mandatory subject of bargaining, provisions with just such a purpose and effect were found within the nonstatutory exemption in *Jewel Tea, supra,* and *Berman, supra.* The exhibition-restriction provisions are likewise "intimately related to wages, hours, and working conditions," *Jewel Tea, supra,* 381 U.S. at 689, 85 S.Ct. at 1601, and hence "within the protection of the national labor policy," *id.* at 690, 85 S.Ct. at 1602.

### 4. *Assumption Agreement*

■ Paragraph 11 of the Special Amendment requires a signatory, prior to licensing or selling or in any manner disposing of the right to use or exhibit a program it produces, to secure from the licensee, buyer, or distributee of the program (hereinafter "purchaser") an agreement to assume the signatory's obligations to the Guild director. The would-be purchaser must sign an agreement expressly for the Guild's benefit in which the purchaser agrees to become "directly responsible to the Guild" for key obligations, responsibilities, and liabilities contained in the Special Amendment to the Guild's general collective bargaining agreements with packagers. In particular, the would-be purchaser must agree to assume payment of the director's percentage-of-gross fees, to pay the director's compensation—calculated as a percentage of gross receipts—for use of the program in supplemental markets, and to abide by the exhibition restriction. In addition, the purchaser must agree to provide to the Guild information and records that "the Guild deems necessary to inspect and/or photocopy for the purpose of assuring compliance with all aspects" of the Special Amendment and of the Freelance or Basic Agreement. Finally, the would-be purchaser must agree to the terms of paragraph 11 of the Special Amendment, which requires the purchaser to obtain an Assumption

Agreement from any subsequent purchaser. Pl. Exs. 70, 76.[15]

The language of the Assumption Agreement supports the Guild's contention that its purpose is to guarantee that directors enjoy the compensation and terms of employment that they contractually secure from film packagers. *See* Pl. Exs. 70, 76; Franklin Tr. 1121–22. Paragraph 11 of the Special Amendment is broadly written to ensure that none of the several means available for transferring rights in a television program (*e.g.*, license, sale, distribution) is used to relieve the initial obligor of its ' obligations to the director and the Guild.[16] The transfer of rights in a program can result in a person other than the signatory doing the actual exhibiting or licensing for exhibition and hence potentially avoiding payment of the director's compensation. When a program is sold, the buyer can license it for initial exhibition; even when a program is licensed directly by the signatory, the licensee may further license its exhibition in supplemental markets. Indeed, the latter scenario is the one at which the Assumption Agreement requirement is principally directed. Franklin Tr. 1121–22. That the purpose of the requirement is to guarantee contract performance is indicated as well by the Guild's having given up the requirement in two instances—once in exchange for a security assignment, once in exchange for direct payment by the licensee. Franklin Tr. 1120–31; Gumpel Tr. 1362–63, 1366–67; Def. Ex. 158. Most important, the Guild's concern with compensation and work security is reflected in the several requirements for the execution of Assumption Agreements contained in the Freelance and Basic Agreements of 1978, requirements that are imposed on television networks and stations as well as on others and that date back at least to the 1973 and 1975 versions of those agreements. *See* Pl. Ex. 38 at 32–34, 88–98; Def. Ex. 45 at 34–36, 72–81; Def. Ex. 48 at 57–60; Pl. Ex. 42 at 51–54, 113–21.

Thus, because exhibition rights are easily and variously transferable, and because directors' compensation may legitimately depend on the use made of the products of their effort long after their work is completed, the Guild's need for a guarantee

---

**15.** Paragraph 11 of the Special Amendment states:

> With regard to the program to be produced hereunder, prior to the licensing of such program to a pay television system for exhibition and prior to selling, licensing, distribution, giving or in any other way disposing of the rights in or permitting the use or exhibition of such program to or by any other company, business, person or entity (hereinafter, "licensee, distributor or buyer") the Company shall provide to the Guild a separate written Assumption Agreement made expressly for the benefit of the Guild and signed by such licensee, distributor or buyer wherein such licensee, distributor or buyer agrees to become directly responsible to the Guild for the assumption of all obligations, responsibilities and liabilities contained herein or in the FL&T and such Agreement shall expressly mandate that such licensee, distributor or buyer shall provide to the Guild such information and/or records as the Guild may require so as to assure compliance with all of the terms and conditions herein and with all of the terms and conditions of the FL&T. Pl. Ex. 76.

**16.** A standard form of the Assumption Agreement is, in full, as follows:
ASSUMPTION AGREEMENT

For good and valuable consideration, the undersigned _____ Company herewith enters into this ASSUMPTION AGREEMENT with and for the express benefit of the Directors Guild of America, Inc. and hereby acknowledges that it has read the foregoing SPECIAL AMENDMENT executed between the Guild and _____ Company and agrees that it is the "licensee, distributor or buyer" referred to in paragraph 11 thereof. The undersigned herewith expressly agrees to assume and be bound by the obligations set forth in said SPECIAL AMENDMENT with regard to certain compensation payments required thereunder, for the following programs:

_____
_____
_____

Specifically, the undersigned agrees to assume the obligations, responsibilities[,] liabilities, and undertakings enumerated in paragraphs 6, 7, 8, 9, 10, of said SPECIAL AMENDMENT and further agrees specifically to be bound by each and every provision of paragraph 11 of said SPECIAL AMENDMENT, in favor of and for the benefit of said Directors Guild of America, Inc.
Pl. Ex. 76.

such as that provided by the Assumption Agreement is, on the record in this case, demonstrably strong. The paucity of evidence on the issue is directly attributable to HBO's failure clearly to develop this aspect of its claim until its post-trial brief. In any event, such evidence as is in the record is sufficient, standing alone, to require the finding that the Guild faces danger to the wages of its director-members from financially weak exhibitors and from pay television's great reliance on reruns. The potential for exhibitor noncompliance with the percentage-of-gross compensation provision and the existence of other, analogous requirements for Assumption Agreements in current and earlier Guild collective bargaining agreements both evidence that need. So too does the fact that a significant number of packagers are funded by such licensees as HBO. In the distinctive entertainment industry context, in short, the Guild's Assumption Agreement requirement serves "legitimate union objectives" at least as strongly as did the agreements challenged, and upheld, in *Berman Enterprises Inc. v. Local 133, United Marine Division, ILA, supra* (work preservation, safety, prevention of erosion of work standards, wage protection). Consequently, the requirement comes within the nonstatutory exemption.

■ Alternatively, the Guild's requirement of an Assumption Agreement does not unreasonably restrain trade and hence does not violate the Sherman Act. *See Berman Enterprises Inc. v. Local 133, United Marine Division, ILA, supra,* 644 F.2d at 936–37. The Guild has demonstrated a need for the Assumption Agreement, and HBO has failed to prove any significant anticompetitive intent or effect. Indeed, it seems likely that the Assumption Agreement works to encourage production company competition by giving additional security to otherwise risky operations. That conclusion is solidly supported by the Guild's analysis of the reasonableness of the requirement. *See* Def. Post-Trial Memorandum 130–38. HBO has advanced no evidence or argument to the contrary.

A different conclusion might be warranted if HBO had demonstrated a significant impact on the product market—by showing, for example, that the Guild was using the Assumption Agreement for organizational purposes among purchasers' employees and was thereby restraining the product market. The Assumption Agreement by its terms leaves the signatory free to choose purchaser and purchase price, just as it leaves the purchaser free to set the fees for licensing in supplemental markets. The only aspects of the product sale restrained by the Assumption Agreement are those "so intimately related to wages, hours, and working conditions that ... [they fall] within the protection of the national labor policy and [are] therefore exempt from the Sherman Act." *Local 189, Amalgamated Meat Cutters v. Jewel Tea Co., supra,* 381 U.S. at 689–90, 85 S.Ct. at 1601–1602 (footnote omitted). The Assumption Agreement, which specifies the paragraphs of the Special Amendment with which the purchaser is to comply, makes the purchaser responsible for compliance only with the compensation and exhibition terms of the Special Amendment, provisions that are themselves lawful and that require for their enforcement a guarantee of the sort provided by the Assumption Agreement. The Assumption Agreement therefore does not force purchasers of programs, such as HBO, into the same posture as signatories.

If the Assumption Agreement actually compelled purchasers to abide by all terms of a collective bargaining arrangement, and thereby subjected them to all the duties of an employer party to a collective bargaining agreement, the product market would be burdened by the union's effort to force all exhibitors to become signatories. Although such an objective would be permissible if accomplished through the union's unilateral action, it might be unlawful if established in combination with packagers, especially if sought for anticompetitive purposes. Indeed, regardless of whether antitrust law would proscribe such action, labor law would not permit the Guild to use its collective bargaining agreements with signatories as vehicles for forcing all exhibi-

tors in effect to enter into collective bargaining agreements with the Guild.

In *NLRB v. National Maritime Union*, 486 F.2d 907 (2d Cir. 1973), *cert. denied*, 416 U.S. 970, 94 S.Ct. 1993, 40 L.Ed.2d 559 (1974), the Second Circuit found unlawful under section 8(e) of the NLRA a provision in a collective bargaining agreement that required a vessel-owner employer to obtain from any purchaser of a vessel a commitment to comply with the union contract. The Court held, following *National Woodwork Mfrs. Ass'n v. NLRB*, 386 U.S. 612, 644–45, 87 S.Ct. 1250, 1268–1269, 18 L.Ed.2d 357 (1967), that the provision violated the labor law ban on hot cargo agreements because it was not " 'addressed to the labor relations of the contracting employer *vis-a-vis* his own employees.' " 486 F.2d at 912. In particular, the challenged provision served principally to promote the union's organizational interests in competition with a rival union's organizational interests, even at the expense of the interests of employees in the particular bargaining unit. *Accord, Danielson v. International Org. of Masters, Mates & Pilots*, 521 F.2d 747, 751–53 (2d Cir. 1975).

If the Guild here required a signatory to force a purchaser to adopt the Guild collective bargaining agreement, that requirement would seem, under the principles of the *National Maritime Union* case, to violate section 8(e). The argument has special force in this case, because the Guild began to enforce its Assumption Agreement only after it failed in its efforts to obtain an agreement with HBO through collective bargaining. Indeed, the testimony and demeanor of Guild witnesses left little doubt that one intended object of the Assumption Agreement was to put pressure on HBO to agree to the same terms that HBO had rejected in the Guild's unilateral negotiations. In those circumstances, such a Guild requirement not only . would violate labor law but might, because of its impact on the product market, violate antitrust law as well. *See Connell Constr. Co. v. Plumbers & Steamfitters Local 100, supra* (hot cargo agreement held violative of § 8(e) and outside nonstatutory labor-antitrust exemp-

tion); *Commerce Tankers Corp. v. National Maritime Union*, 553 F.2d 793, 801–02 (2d Cir.), *cert. denied*, 434 U.S. 923, 98 S.Ct. 400, 54 L.Ed.2d 280 (1977) (agreement found to violate § 8(e) in *NLRB v. National Maritime Union, supra*, might be nonexempt and might violate antitrust law). *But see Smitty Baker Coal Co. v. United Mine Workers*, 620 F.2d 416, 436–37 (4th Cir.), *cert. denied*, 449 U.S. 870, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980) (UMW agreement with mine operators that required operator to secure from any person who leased mine from operator a commitment to comply with full UMW contract, held mandatory subject of bargaining and "insufficient as a matter of law to support an antitrust action"); *Handler & Zifchak, supra*, 81 Colum.L.Rev. at 514 ("what is prohibited by labor law should not also be prohibited by antitrust").

Nevertheless, the Assumption Agreement does not in fact force a purchaser such as HBO into a collective bargaining relationship with the Guild and has not in fact been used for that purpose. It merely imposes on parties purchasing pay-television rights on programs directed by Guild members the obligations to .pay the director's compensation and to comply with the exhibition restrictions, both of which depend on the exercise of those television rights. It imposes none of the special duties to which employers in a collective bargaining relationship are subject. The Guild is not seeking to promote its organizational interests outside the unit; neither is it motivated by a rivalry with a competing union. The evidence shows that the Guild has done nothing other than seek to protect or advance the wage and job interests of director employees of signatories. The Guild has even dropped the Assumption Agreement requirement in several instances, substituting other means of guaranteeing directors' compensation. The Assumption ·Agreement requirement, in sum, serves primary rather than secondary objectives and, as a consequence, is lawful under section 8(e).

The open records requirement is valid for the same reason. The requirement tracks the mandate of the NLRA that an employer

disclose whatever information is relevant and necessary to the union in its role as bargaining representative. *Lodges 743 and 1746, Int'l Ass'n of Machinists v. United Aircraft Corp.*, 534 F.2d 422, 458 n.62 (2d Cir. 1975), *cert. denied*, 429 U.S. 825, 97 S.Ct. 79, 50 L.Ed.2d 87 (1976); *see* R. Gorman, *supra*, at 409–15. The requirement is here imposed on the purchaser rather than on the employer, but only when the purchaser becomes the party responsible for compliance with some of the terms of the collective bargaining agreement. Moreover, although the requirement might be read to compel sweeping disclosure of records by the purchaser, HBO has presented no instance of an arbitrary or overintrusive construction of the requirement; nor has HBO shown any likelihood that the Guild will so construe it. The requirement can reasonably be construed to permit disclosure of records only to the extent necessary to enable the Guild to monitor compliance with the contract. So construed, this provision is "intimately related to wages" and therefore exempt from antitrust challenge.

### Conclusion

For the foregoing reasons, the Guild's conduct is exempt from antitrust challenge. Even assuming the contrary, however, HBO has shown neither that the Sherman Act has been violated nor that it is entitled to equitable relief. HBO has not responded to the Guild's argument that its conduct is a reasonable restraint of trade if a restraint at all. *See Berman Enterprises Inc. v.*

*Local 133, United Marine Division, ILA, supra*, 644 F.2d at 936–37 (rule of reason test); Handler & Zifchak, *supra*, 81 Colum. L.Rev. at 510–13 (reasonableness test); Leslie, *Principles of Labor Antitrust*, 66 Va.L. Rev. 1183, 1223–33 (1980) (*Apex Hosiery Co. v. Leader, supra*, should be read to establish test for Sherman Act violation requiring actual restraints on commercial competition). Most significantly, HBO has advanced no persuasive evidence of any "threatened loss or damage" to its business caused by the Guild's actions and enjoinable by a court of equity. 15 U.S.C. § 26 (1976). Indeed, HBO dropped its initial request for damages, though damages of the sort alleged would seem to be measurable. The only evidence in the record concerning HBO's financial health demonstrates that HBO has expanded ahead of schedule, that virtually all planned productions have been produced, Furst Tr. 116–22, Fuchs Tr. 197–98, and that HBO has earned profits substantially exceeding its own projections. *See* Def. Exs. 800–13. HBO's claim of injury, in short, is vague and speculative. *See* Fuchs Tr. 270–303. An injunction against a union for violation of the antitrust laws cannot be issued on a showing insufficient to support an injunction against a nonunion antitrust defendant; the federal policy against labor injunctions in fact suggests special caution in enjoining union activity. In these circumstances, therefore, equitable relief seems inappropriate even if a legal violation could be found.[17]

17. The complexities and uncertainties of labor-antitrust law have reached such proportions that perhaps courts should begin their analysis of such cases by examining whether an antitrust violation warranting injunction has been alleged or shown, even if the conduct is non-exempt. The extensive analysis and consideration of labor law analogies, as well as of the labor-antitrust precedents, would thus be avoided in all cases except those in which an unreasonable restraint on the product market warranting equitable relief is proved. Of course, the irony in this suggestion is that the labor exemption was presumably designed sharply and clearly to curtail the application of antitrust laws in situations where labor has acted unilaterally or obtained agreements with employers at arm's length and that apply only to the relevant bargaining unit. The Supreme Court's willingness to apply those laws to situations regulated by labor laws—whether permitted or prohibited—may largely have deprived the exemption of its potentially salutary purposes, without providing significant compensating advantages, since Congress, the NLRB, and the courts can in the future, as they have repeatedly done in the past, check labor actions inconsistent with the public interest through labor-law proscriptions. *Compare generally* Winter, *Collective Bargaining and Competition: Application of Antitrust Standards to Union Activities*, 73 Yale L.J. 14 (1963) (fundamental questions of labor policy should be left to labor legislation) *with* Meltzer, *Labor Unions, Collective Bargaining, and the Antitrust Laws*, 32 U.Chi.L.Rev. 659 (1965) (excessive union power unlikely to be effectively checked by general antitrust laws but labor law

**614**

Judgment must be entered for defendants, with prejudice and costs.

SO ORDERED.

coverage and antitrust law coverage should not be mutually exclusive).